BURNHAM and another, Executors, Respondents, vs. THE CITY OF MILWAUKEE, Appellant.

*March 23 — June 23, 1898.*

*Municipal corporations: Contracts: Extras: Defective plans: Matters to be determined by board of public works: Its decision, when final: Negligence: Presentation of claims: Custom: Evidence: Settlement: Estoppel: Agency.*

1. A contractor for the construction of a wooden sewer cannot hold the city liable on the ground of imperfections in the plans because of the impracticability of making with such a sewer a certain re-

quired turn, where such impracticability was obvious on the face of the plans.

2. Where a contract for the construction of a sewer provided that an extra foundation therefor, of the nature indicated in the plans, should be built whenever, in the opinion of the board of public works, the same should be necessary, and where, from the nature of the situation, no human foresight could determine in advance whether a foundation would be necessary or not, the contractor cannot hold the city liable for extra work alleged to have been made necessary by defective plans, on the ground that the plans did not absolutely require the extra foundation.

3. It being, by the terms of the contract, a matter resting wholly in the judgment and discretion of the board of public works whether an extra foundation should be required or not, the decision of the board in that behalf is final unless impeached for fraud or dishonesty; and where the board, after due consideration, has refused to order a foundation to be put in, no liability on the part of the city arises because the work is more expensive to the contractor than it would have been had the foundation been ordered; nor can such a liability be based on a finding that the board obstinately and unreasonably refused to order or permit the foundation to be placed under the sewer and that by reason thereof it was guilty of gross negligence.

4. Where, by law and by a contract with a city, the board of public works was given power to adjust and determine finally all questions as to the proper performance of the work and the amount earned under the contract, and it was provided that the contractor must make out and present to the board a written statement of the amount claimed for extra or additional work and materials, there can be no recovery for such extras unless the claim therefor was presented or some legal excuse is shown for its nonpresentation; and, where the claim had in fact never been presented, it is not a sufficient excuse that the board knew the contractor had a claim and had from time to time discussed matters with him, or that the board refused to act on his claims or to give him a full and fair hearing in the matter.

5. The requirement that a written statement of a claim for extras should be presented was not complied with by the contractor going before the board with his accounts in his pocket, contained in various books of account; and the board was justified in refusing to act upon the claim in that shape.

6. The positive requirements of such a contract as to the presentation of claims for extras cannot be overturned by proof of a custom or usage to the contrary.

7. A contractor for the construction of a sewer who expressly assumes all risk from the influx of water into the work cannot recover extra compensation for pumping out such water because the work proved more laborious or more expensive than he anticipated.

8. Where a contractor for the construction of a sewer makes a claim to recover for extra labor and materials, and from the nature of the case it is impossible for the city to controvert the claim, it is not sufficient for him to show merely the expenditure of a certain amount of money in the work, but he must show by satisfactory evidence that the work for which the money was expended was entirely distinct from the original contract and directly connected with and necessary to the completion of the work.

9. Where all the right of a contractor to compensation for extra labor and materials in certain portions of the work had accrued at the time a claim for such extras was presented and allowed by the board of public works, which board had power under the contract to adjust and determine finally all such questions, he cannot afterwards obtain additional compensation by including in his final bill a further claim for extras in respect to the work so settled for.

10. In such a case, one who, though not the nominal contractor, was the real party in interest, is chargeable with the consequences of the acts of his representative, the nominal contractor, and cannot, after accepting the fruits of those acts, surcharge his accounts and plead ignorance of the situation.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

On October 29, 1880, one Michael Rice, with George Burnham and S. Bryant as sureties, entered into a contract with the city of *Milwaukee* to build and construct section No 2 of the Menominee special sewerage works, running along Park, South Water, and Oregon streets a distance of about 4,500 feet, according to design C, mentioned in certain plans and specifications on file in the office of the board of public works, for $10.92 per lineal foot. Such work was to be completed on or before June 1, 1881. The contract further provided that certain classes of extra work furnished and put in foundations, when ordered by the board of public works, among other things, should be paid for as follows: Common lumber, $20 per thousand feet; pine piles driven,

30 cents per lineal foot; brick laid, $19 per 1,000. It also contained other provisions deemed material to this litigation, as follows: That the said board of public works shall have the right and power, and the same is hereby reserved to said board, to adjust and determine finally all questions as to the proper performance of the contract, and as to the amount earned under the contract, according to the true intent and meaning thereof; and that any and every such adjustment and determination by them should be final and conclusive, and binding upon the parties. The specifications contained a number of conditions applicable to the facts here involved. It was provided that the sewer must be made watertight, and, if leaks were discovered, they must be calked or otherwise effectually stopped. Extra foundations ordered by the board were to be measured and paid for according to schedule rates, but no allowance was to be made for extra excavation in putting in foundations. The contractor was to make all necessary provision for removing water, and to take all risks arising from any sudden influx of water into the work. The right was reserved to the board to make any changes in the plans and specifications deemed necessary or desirable, and *the price for extra work was to be agreed upon by the board and the contractor before the work was commenced.* On or before the 1st day of each month the contractor must deliver to the board a written statement of the amount of claim for such additional extra work done and material furnished during the previous month. The contract was made expressly subject to the powers given the board of public works by sec. 20, subch. 5, ch. 184, Laws of 1874, and all subsequent amendments.

Rice entered upon the work of constructing the sewer, but, becoming involved, on April 6, 1884, assigned the contract to his sureties, who proceeded with the work to completion. Burnham died, and this action is brought by his executors to recover for certain extra work alleged to have

been done by Rice and Burnham in carrying out the contract. The action was commenced February 12, 1887.

The complaint, so far as material, alleges the making of the contract; that the sewer was to be a timber sewer; that Rice commenced the work; that a portion of the sewer was built of brick by agreement; that the other portion of the sewer, to be built of wood, was built through "soft, wet, and marshy" ground; that a foundation for it was necessary, but the board of public works refused to order one laid; that the sewer settled, and water came in, and the board ordered Rice to pump it out; that he hired pumps at great expense, pumped out, and calked the sewer, and that the same came under the head of extra work; that there was a curve in the sewer that could not be constructed of wood, and the board ordered it constructed of brick eight inches thick; that the wall was too light, and caved in, and the board ordered it rebuilt from one to two feet thick, which was done at a cost of $6,000 for extra work, materials, and the pumping necessary; that Rice, becoming insolvent, assigned the contract and all rights under it to Burnham, who went on to complete the sewer; that the specifications provided for a straining chamber, and Rice was directed to build it according to certain stakes located by the board; that Rice proceeded to build the same (and could have completed it at a cost of not exceeding $1,750), and had it nearly finished, when the board learned that defendant did not own the land upon which it was located, and ordered work stopped, and designated a new location. Rice proceeded, and had the excavation about completed, when it was discovered that it could not be completed without a pile foundation, and it became necessary to fill up the excavation. Thereafter Rice commenced work the third time, but was prevented from completing it on account of the loose and porous condition of the ground, allowing the water to rush in. The work was stopped until the city built a dock along

the river, and a fourth attempt to complete the straining chamber was made. The work had to be abandoned on account of excessive water. Burnham afterwards completed it, and the extra work and expense by reason of the premises was $10,949. The sewer was accepted January 30, 1885. The extra work and materials furnished by Rice were worth $19,403, and by plaintiffs $10,949, from which the cost of finishing the straining chamber, $1,750, should be deducted, leaving a net balance for extras $28,602.

The complaint then sets out an attempt to secure action on the claim for extras by the board of public works, but that Burnham was prevented from securing a hearing, and that the board found there was due on the contract $4,787.48; that said allowance by the board included but about $700 for extra work and materials, and made no account of the extra work and materials furnished by Rice and Burnham as before set forth; that the common council of the city denied relief upon a petition duly presented; that the board of public works, on September 8, 1886, refused to enter into any accounting or adjustment of such matters, and nothing has been paid.

Attached to the complaint are Exhibits A and B, being a detailed account of expenditures made for extra coal, labor, and materials, and for cash paid for use of steam pumps, an item "for superintending the rebuilding of curve, 25 per cent., $1,500;" another "for superintending repairing of sewer, 15 per cent., $1,500;" and a third, "use of teams and two pumps and superintendence, $2,000."

The answer contains certain admissions and denials, and sets out certain provisions of the contract and specifications before mentioned; admits the error in the location of the first straining chamber; alleges that no written statement of plaintiff's claim for extra work was ever presented or furnished the board of public works, except a claim for extra work on the straining chamber, a copy of which is attached

to the answer; that the same was fairly considered by the board, and a fair adjustment made, and that the amount of $4,787.48 was the amount found due on the contract and for the work done.

The case was referred to hear, try, and determine, and, after years of delay, on April 23, 1896, the referee filed his findings in favor of the plaintiffs. The report of the referee was duly confirmed, and judgment entered against the city for $56,827.66 and costs, from which this appeal is taken.

The plaintiffs' claim sought to be recovered may be grouped under three heads: First, extra work and materials furnished by Rice, $19,413; second, extra work and materials furnished by Burnham, $10,949.01; third, amount allowed by the board of public works, $4,787.48. The first two items are based upon the failure of the board of public works to cause a foundation or cradle to be placed under the sewer over the muck bed, the change in the curve and in the straining chamber, and the extra work and expense in pumping the water out of the trenches during the progress of the work.

The city appeals from the judgment entered upon the referee's report.

*Howard Van Wyck*, city attorney, with *Charles E. Estabrook* and *W. H. Timlin*, of counsel, for the appellant.

For the respondents there were briefs by *Rogers & Mann* and *Miller, Noyes, Miller & Wahl*, and oral argument by *Geo. P. Miller* and *E. S. Mack*. To the point that the city guaranteed the plans and was responsible to the contractor for the extra work made necessary by the fault of the plans and the blundering misdirection of the work by the board of public works, whose orders the contractor was obliged to obey, they cited *Bentley v. State*, 73 Wis. 417; *Sinnott v. Mullin*, 82 Pa. St. 340; *Kellogg Bridge Co. v. Hamilton*, 110 U. S. 113; *Burke v. Dunbar*, 128 Mass. 499; *Seymour v. Long Dock Co.* 20 N. J. Eq. 396.

BARDEEN, J. The record we are called upon to inspect and examine bears the handiwork of very many learned and skilful legal artists. The names of six able and competent lawyers appear on the briefs of respondent, and the learned referee informs us "that the defense of this action has been conducted by four different city attorneys with conspicuous zeal and ability, which would certainly have resulted in a victory for the city if the facts in the case had made such a victory possible." We are confronted with no less than five briefs of considerable length, which have served to increase our labors with no great corresponding benefit. The practice of filing several briefs, unsanctioned by any rule, tends rather to the confusion than the enlightenment of the court. Several important and interesting questions are involved in the decision of this case, which have been ably argued by counsel, and which we have taken time to consider with the attention and deliberation their importance and difficulty seemed to require.

The plaintiffs' claim seems to be one largely sounding in damages, based upon certain alleged faults or imperfections in the plans and specifications for the sewer, and shortcomings of the board of public works, but, inasmuch as counsel on both sides, as well as the referee, have treated it as a claim for extra work under the contract, we shall consider it in that view. So far as we are able to group the claims upon which the plaintiffs' right of recovery is based, they are as follows: (1) Defects or imperfections in the plans and specifications. (2) Failure of the board of public works to provide a suitable foundation for the sewer where it passed over soft and mucky ground. (3) Failure and refusal of the board of public works to settle and adjust the plaintiffs' claims for extra compensation under the contract. (4) Waiver by defendant of the provisions of the contract requiring extra work to be agreed upon and written monthly statements of

the contractor's claims for extra work to be delivered to the board. (5) The character and amount of the plaintiffs' claims for extra compensation, and the action of the board thereon.

1. The plans and specifications do not provide definitely for a foundation to be placed under any part of the work. The specifications, however, contain the following provision: "Whenever the soil is sufficiently firm, the sewer of either design will be laid directly upon the bottom of the proper excavation; but when, in the opinion of the board of public works or engineer in charge, an extra foundation will be necessary to insure stability to the work, the contractor will be required to erect and put into place such timber, piling, brick, masonry, concrete, gravel, sand, or other suitable materials, in the manner directed by the board of public works, which shall be measured by the engineer in charge of the work, and paid for at the schedule rates set forth in the accepted bid of the contractor; but no allowance shall be made to the contractor for any extra excavation incurred by building and putting in place such extra foundation or extra work." The plans contained a sketch or drawing of the foundation to be provided for such sewer whenever the same might be found necessary and be directed by the board of public works; so that with reference to the straining chamber and the sewer proper it was a matter resting wholly in the good judgment and discretion of the board whether a foundation should be required and put in or not. This discretion was to be exercised in view of all the circumstances, and with reference to all of the work required under the contract. The straining chamber was a part of the sewer, and from the very nature of the situation no human foresight could determine in advance whether a foundation would be necessary or not. Any attempt to base a liability on the part of the city because the plans and specifications did not absolutely require a foundation to be placed thereunder is without support.

The sewer in question was what is known as a "barrel sewer," to be constructed of timber, tapering towards the center, with joints broken, and well keyed and secured by spikes or bolts so as to be perfectly watertight. It was to be laid on Oregon and South Water streets. These streets run so as to form an angle of forty-five degrees at the point of intersection, so that at that point there was a curve in the sewer to correspond with that angle. This curve is shown on the plans, and was perfectly evident to any one knowing the location of the streets. The impracticability of making a turn at that point with a wooden sewer was as evident to the contractor at the time he made the contract as when he reached it in the work of actual construction. There was nothing hidden or concealed, no latent defect that had to be discovered by actual experiment. It was open and visible, and appeared on the face of the plans as well as in the lay of the land. To allow the contractor to allege this as a defect in the plans, and to found liability thereon on the part of the city, is letting him out of a contract deliberately made, and imposing a burden on the other party because he is let out. The city guarantees the plans as against any damage or loss that may come to the contractor through any latent defect therein, but when the alleged defect is as well known to the contractor as to the city, and the contractor voluntarily and deliberately enters into a contract to do the work in the way and manner prescribed, he assumes all risks of damages or loss resulting therefrom. But it appears that the contractor did not attempt to construct the sewer at this point of wood. After it was demonstrated that it was impracticable to build it of wood, the board, as they had a right to do, ordered it built with an eight-inch brick wall; and it is because this wall had no foundation, and collapsed, that the contractor makes complaint. This matter will be discussed later, when we come to consider the entire claim. From what has been said, it

seems quite clear to our minds that the contractor has no just claim of liability against the city because of imperfections in the plans and specifications.

2. As has already been stated, the plans and specifications did not specifically require a foundation to be placed under the sewer. Under the provisions already quoted the necessity of such foundation was left to the judgment and discretion of the board of public works. Under the plainest principles, whatever talk or understanding there might have been prior to the execution of the written contract became merged therein, and the *contract* thereafter became their rule and guide with reference to the subject matter thereof. One of the important claims of the contractor is based upon the failure of the board of public works to cause a foundation to be laid under the sewer along South Water street. It is a fact concerning which there is no dispute that for a portion of the distance along said street the soil was wet and marshy, and consisted of black muck, mixed with sand and shells. With reference to this matter the referee finds: " That the plans and specifications contemplated the placing of a cradle or other suitable foundation under said sewer in and along such soil as the South Water street muck bed, and that, if said plans and specifications had been followed and carried out by said board of public works, such foundation would have been ordered." He further found that the board " obstinately and unreasonably refused to order or permit any foundation to be placed under said timber sewer," and that by reason thereof it " was guilty of gross negligence." Along this line he also makes a further finding " that no person of ordinary skill and prudence would have attempted or required the construction of a wooden sewer laid directly upon said muck bed without any cradle or other suitable foundation provided therefor, and that the then city engineer of said defendant city had made special provision in said plans and specifications for such foundation, which

plans and specifications said board of public works, as afore-
said, negligently and unreasonably and unlawfully refused
to permit the contractor to carry out," and that because of
the want of such foundation the sewer spread, and the top
became depressed and seams opened therein, through which
the water rushed, entailing upon the contractor a great
amount of extra expense, labor, fuel, etc. A mere inspection
of the contract, plans, and specifications reveals the fact that
there was no distinct contract obligation on the part of the
city to cause a foundation to be put under any portion of
the work. The city was interested in having a reasonably
stable and permanent structure, and it reserved to the board
of public works the power to determine the necessity of put-
ting in such foundations. To them, and to them alone, is
given authority to decide this matter. No other construc-
tion is possible to the words used. It says, "When in the
opinion of the board of public works  .  .  .  an extra
foundation will be necessary," etc., the contractor will be
required to put it in. The contracting parties have seen fit
to vest in the board the power to exercise such judgment
and discretion as they possess. It is upon their judgment
and opinion in the matter that the necessity for a founda-
tion must rest. When that judgment or discretion has been
honestly exercised, it is final. The matter is not left to the
decision of the contractor, nor to a jury, nor to the opinion
of a referee. The duty cast upon the board is not of a
purely ministerial character. It requires the exercise of
judgment and discretion to a considerable degree, and, when
so exercised, it cannot be impeached by showing that the
judgment or discretion of other parties would have been
different. It is not enough to say that the work required
was more expensive to the contractor than it would have
been had a foundation been ordered, nor will any liability
arise because it is found that the board "obstinately and
unreasonably" refused to order or permit a foundation to

be put under the sewer.  The duties of the board were anal-
ogous to those of an arbitrator or an architect in building
contracts.

In speaking of the binding character of the finding of an
arbitrator, BOVILL, C. J., in *Pappa v. Rose*, L. R. 7 C. P. 32,
at page 42, says: "It by no means follows that when two
persons submit a matter in difference to the arbitrament of
a third, they agree to take a person of the greatest amount
of skill or intelligence.  No matter what may be the degree
of skill he possesses, the decision of the person selected is
final and conclusive."  See, also, same case in same volume,
page 525, and *Tharsis S. & C. Co. v. Loftus*, L. R. 8 C. P. 1.
In this latter case it is distinctly held that there is no dis-
tinction between want of skill and want of diligence of the
arbitrator.  That the parties have agreed to be bound by
his decision for better or worse, and when honestly made, is
conclusive.

Cases are numerous where the parties have contracted
with reference to the skill, judgment, or discretion of an
architect.  In *Hudson v. McCartney*, 33 Wis. 331, DIXON,
C. J., says: "It was clearly competent for the plaintiffs to
stipulate that they should only demand or receive payment
for the work as the same was executed to the full and com-
plete satisfaction of McDonald, the superintendent of the
erection of the dwelling, and upon his certificates as the
work progressed; and such satisfaction of the superintendent,
and the execution of the certificate by him, became and was
a condition precedent to the right of the plaintiffs to de-
mand or sue for the price agreed to be paid by defendant
for the work, unless the refusal to certify should be disre-
garded or annulled on the ground of fraud or bad faith, or
clear evidence of mistake on the part of the superintendent.
And, should the certificate. be fraudulently or corruptly
withheld by the superintendent, it would be the opinion of
some most respectable courts that there could be no recovery

Burnham and another vs. The City of Milwaukee.

against the defendant, unless the withholding was in collusion with him and by his procurement. It has been held that the refusal to accept or certify must be shown to have been the wrongful or fraudulent act of the defendant, as well as of the surveyor or architect. *Clarke v. Watson*, 18 C. B. N. S. (114 Eng. C. L.), 278; *Batterbury v. Vyse*, 2 Hurl. & C. 42." The learned chief justice further says: "If fraud in the arbiter can be established by proof that he refused to certify the execution of the work when the same had been duly performed, it can only be in those cases where the refusal is shown to have been grossly or palpably perverse, oppressive, and unjust, so much so that the inference of bad faith and dishonesty would at once arise when the facts are known." The principles here laid down have been recognized in many subsequent cases. *Tetz v. Butterfield*, 54 Wis. 242; *Stubbings v. McGregor*, 86 Wis. 248; *Wendt v. Vogel*, 87 Wis. 462.

These cases are cited only to sustain the proposition that, when contracting parties have seen fit to vest in some person the exercise of some judgment and discretion relative to the subject matter of the contract, no liability can arise in the exercise thereof, unless it be shown that his acts or refusal to act were so palpably perverse as to clearly indicate bad faith and dishonesty. Neither the evidence in the case nor the finding of the referee justifies any such conclusion. The sewer along South Water street was over a quarter of a mile in length. For a greater portion of the distance it was constructed over marshy and porous soil. The evidence is practically undisputed that the bottom of the sewer did not sink. A portion of it, from seventy-five to one hundred feet, when the top had depressed, was rebuilt. The remainder seems to have stood in good shape, and was accepted by the city after the seams and abutting ends of timber had been calked to prevent the influx of water. The rebuilt portion, so far as we are able to discover, was reconstructed without a foundation, and the whole line was standing in good shape

when inspected by Schneider, some years afterwards. This fact would seem to vindicate the judgment of the board. There is quite as much reason for saying that the settling of the crown of the sewer was the result of the want of proper tamping along the sides of the sewer, and deficient nailing of timbers, as to say that it settled for want of a foundation. The positive finding by the referee that the board were guilty of negligence is opposed to and inconsistent with the finding that they *refused* to order foundations to be put in. The undisputed evidence shows that their attention was called to the situation, and, after due consideration, they *refused* to order a foundation laid. They duly exercised the judgment and discretion vested in them by the terms of the contract, and to say that, because they refused to order the foundation laid, they were guilty of negligence, is certainly an incongruity hardly warranted by the facts. It amounts to nothing more than an attempt to impeach the capability of the arbiters appointed in the contract, by substituting the judgment of witnesses and that of the referee in place of the men duly appointed to act. As we have seen, the law does not permit this to be done. Nothing short of a showing of fraud or dishonesty on their part will suffice, and, that conclusion being neither warranted by the evidence nor the finding of the referee, the plaintiff has failed to show a right of recovery on this branch of the case.

3. It is insisted with great earnestness that the board of public works failed and refused to settle or adjust the plaintiffs' claims for extra compensation under the contract. By sec. 20, subch. 5, ch. 184, Laws of 1874, the power is given the board of public works to determine all questions as to the amount earned under any contract according to its true intent and meaning, and it is provided that such adjustment and determination by said board shall be final between the parties, and binding upon them. It also provides that every contract with the city shall be made expressly subject to the

power given to the board by this section. The contract under consideration was made subject to the provisions of this section, and contained similar provisions with reference to the powers and duties of the board. The contract also contained this further provision: "The board of public works reserves the right to make any changes in the plans and specifications that the board may deem desirable and necessary, and the contractor shall furnish any additional material, and do any additional work, required by such changes; the price for said extra work to be agreed upon by the board of public works and the contractor before the work is commenced. *On or before the first day of each month*, the contractor must deliver to said board a written statement of the amount of claims, if any, for such additional or extra work done and material furnished during the previous month."

It needs but an inspection of the charter provisions and the contract to disclose the fact that the contractor was required thereby to present to the board a written statement of his claims for extra work or materials. It is an admitted fact that there has been no compliance with this requirement. Except in certain particulars, hereinafter noticed, there has been no *attempt* to comply therewith. The board of public works were appointed, by law and by the contract, arbiters to adjust and determine the proper performance of the work and the amount earned under the contract according to its true intent and meaning. It was likewise made the duty of the contractor to make out and present to them a written statement of the amount claimed for extra or additional work and materials. The claim sued upon, or anything like it, has never been presented.

The only excuse offered is that the board knew the contractor had a claim for extras, and from time to time had discussed matters with him, and it seems to be assumed that, because certain inspectors and certain members of the board were present during the progress of the work and knew

what was going on, such a presentation was unnecessary.
The evidence is conclusive that the contractor was requested
at different times to present his claim. The nearest approach
to anything of this kind is found in the testimony of Mr.
Crilley when he says that he went with Mr. Burnham before
the board, and had all the items of the account with him in
his books, but was given no opportunity to present them.
In a matter so important, and where the claims of the con-
tractor were to be acted upon by a board having *quasi-*
judicial powers, it was certainly essential that his demands'
should be formulated into such shape as to enable them to
act upon them understandingly and intelligently. To go
before the board with his accounts in his pocket, contained
in various books of accounts, is certainly no compliance with
reasonable requirements, and the board were certainly justi-
fied in refusing to act upon them in that shape, if in fact
they did so refuse. It affords no reasonable grounds for
excuse to say that the board refused to act on the contract-
or's claims, so long as the fact appears that his claims had
never been presented to them. The obligations and duties
of contracting parties towards each other cannot be brushed
aside so lightly. The terms and conditions of the contract
must be substantially complied with, or some legal excuse
shown for not complying with them, before an action thereon
can be sustained.

The plaintiffs' dilemma is not relieved by the finding of
the referee. He simply finds that, after the work was com-
pleted, Burnham "made numerous attempts to induce the
said board of public works to adjust and settle his various
claims for extra compensation under said contract, and that
said board refused to give the said Burnham a full or fair
hearing in and about said matter." It appearing affirm-
atively that no statement of the contractor's claims was ever
presented, it is but a waste of time to pursue this discussion
further.

4. The fourteenth finding of the referee is as follows: "That it appears in evidence herein that by the invariable custom and manner of doing business adopted by the board of public works, claims of the contractor for extra work were not required to be put in, and were not considered, until the entire work was completed." This finding seems to have been made in view of the requirement of the contract before quoted, that monthly written statements of claims for extras should be delivered to the board. It ignores the further provision that extra work shall be agreed upon before the work is commenced. The only testimony we are able to find that supports this finding is that of Mr. Crilley when he says: "The usual custom is for the contractor to meet with the board of public works when there is extra work, and discuss it, and agree as to the price. That is the usual custom. We never render a bill for extras. The board in charge of that portion of the work have their own clerk make out the bill. In city contracts we never make out our bill for extras until the work is completed and accepted." As opposed to this statement, the undisputed evidence shows that on January 23, 1882, Rice, the original contractor, filed claims for extra work and materials done at the curve, which was adjusted and allowed by the board in March following. On March 17, 1884, Rice presented a claim to the common council for extra work on the straining chamber. On January 31, 1885, and before the sewer was accepted, Burnham presented a claim for extras at the straining chamber, amounting to $7,232.82, exclusive of a certain credit given for estimated cost of completing first straining chamber. It also appears from Mr. Crilley's testimony that the board demanded a bill of the extras at the curve soon after it was finished. Such being the evidence in the case, it is difficult to understand how the referee could reach the conclusion he did. The terms of the contract were express and definite as to the necessity of pre-

senting claims for extras. As before suggested, the referee seemed to appreciate the necessity of making some finding that would seem to nullify the positive requirements of the contract. He does not find that there is any waiver of this condition except as he finds the custom, and he attempts to overturn a positive contract by admitting evidence of the custom and making a finding of its existence. The rule is well-nigh universal that usage and custom are never allowed to operate against express contracts. *Brown v. Foster*, 113 Mass. 136; Lawson, Usages & Customs, 434, where a large number of cases bearing on this question are collected. The finding of the referee is not only contrary to the evidence, but contrary to law.

5. It now remains for us to consider the character and amount of the contractor's demands, and the action of the board with reference thereto. Aside from the amount admitted to be due by the defendant, which will be noted hereafter, the plaintiffs base their right of recovery upon the failure of the defendant to cause a foundation to be placed under the sewer, and the change in the curve and the straining chamber. To their complaint are attached two exhibits, supposed to contain a statement of their claims. The first (Exhibit A) commences in June, 1881, and runs to June, 1882, and assumes to cover the expenditures made by Rice while attempting to carry out the contract. It is made up of items for fuel, use of pump, and labor, amounting to $15,639; brick, extra spikes, and extra lumber, $774; and superintendence, $3,000,— making, in the aggregate, $19,413. The larger amount is made up of items ranging from $35 to $1,870, without dates, except the names of the months are noted on the margin, and running through a period of thirteen months. The other claim (Exhibit B) commences April 17, 1884, and runs to May 7, 1885. It is itemized somewhat more at length than the other exhibit as to amounts and dates, but is equally indefinite as to what part of the work

it was expended upon, or at what particular crisis of the job the expenditure was incurred. It says: "To cash paid, services rendered;" "To cash to men, labor," paid at many different dates; "Cash, teaming," — and the like. It also includes an item of $600 paid Crilley for use of steam pumps and engine, and another of $2,000, "use of teams and two pumps and superintendence," — in all, $10,949.01, — or a grand total for both claims of $30,362.01. In the findings requested by plaintiffs it was conceded that from this amount there should be deducted $1,750 for work, labor, and materials to complete the first straining chamber, and $1,622.63, which amount had been allowed and paid on account of the work, labor, and materials furnished; but the referee generously reduced the last-mentioned credit to $1,227,75, and gave judgment for plaintiffs' entire claim, together with the amount admitted to be due by the defendant. We have carefully examined the evidence offered to support these various claims, and say without hesitation that it fails to support the plaintiffs' contention or the referee's conclusions. Mr. Crilley was the main witness for plaintiffs to sustain these alleged expenditures. Referring to Exhibit A, he says: "I kept an account of the losses incurred on extra work in pumping out that sewer and labor. That bill was copied from the books in which that account was kept by me. I looked over the items at the time, and the charges are absolute expenses of the work from June, 1881, to June, 1882. I cannot give just the items of extra work. The items specified in this exhibit are taken from my book that I kept at the time, and correctly represents, month by month, the actual money expended for labor and materials for carrying out the extra work ordered by the board of public works on this contract." In the first place, there is no evidence that the board ever ordered the extra work alleged to be covered by this claim. Over $10,000 of this claim is for use of pumps alone. The contract says, "The contractor is to take all

risk from the sudden influx of water into the work, and be prepared to remove it promptly." The only ground upon which this claim for pumping rests is that, if the board had ordered a foundation or cradle for the sewer, it would not have been necessary. This is a matter of pure speculation. Crilley says that in attempting to keep the water out of the sewer he pumped a neighboring marsh dry. Who can say how much of this water would have come in had there been a foundation put under the sewer? The contractor took the risk of the influx of water, and, if the work was more laborious or more expensive than he anticipated, he assumed the risks, and cannot rightfully ask the city to carry the burden for him. There are many other circumstances in the testimony bearing on this feature of the case, but the inordinate length of this opinion forbids further discussion. Suffice it to say that they tend to the further confusion of the plaintiffs' claim. The item of $3,000 for superintendence was a gratuity awarded the plaintiffs without a shred of legal right to support it.

The testimony to support Exhibit B is even more unsatisfactory. The bill itself furnishes absolutely no information as to the circumstances under which the expenditures were incurred, and it is not helped out by the oral testimony. There are dozens of items, "Cash, pay men;" also for cash paid to different men and firms, without any explanation as to the purpose or necessity therefor. One of the most familiar rules of evidence is that the best evidence the nature of the case is susceptible of should be produced. It is significant in this case that the books containing a record of the expenditures, etc., claimed to have been incurred by the contractor were not produced. Owing to the peculiar nature of the plaintiffs' claim, it was necessary that they make out a case with reasonable certainty, and to produce such evidence as would enable the court to readily ascertain a basis upon which to found a recovery. *Maas v. Succession of*

*Hernandez,* 48 La. Ann. 264. The situation was such that from the very nature of things it was impossible for defendant to controvert the plaintiffs' claim. It was, therefore, incumbent on the plaintiffs to show by satisfactory evidence that the work for which the money was expended was entirely distinct from the original contract and directly connected with and necessary to the completion of the work. The conclusion of a witness cannot be accepted as the fact. There should have been proof of facts and circumstances which, being coupled with the witness's conclusion, would justify the court in finding the existence of the fact. The inquiry was as well how much the defendant ought to pay as how much the plaintiffs ought to have. Plaintiffs were seeking a recovery on *quantum meruit.* The bald statement of the expenditure of so much money in the work proves nothing. What was the consideration for such payment? Were the prices reasonable? Were the men employed at going wages? All these are pertinent inquiries, and to which the evidence affords no answer.

The evidence shows that when the excavation of the straining chamber was about completed, it was discovered that it had been located on land to which the city had no right, and the location was changed. On March 17, 1884, Mr. Rice, the contractor, presented a petition to the common council, setting out the change, and stating that he had been put to large expense, being obliged to sink two chambers instead of one, and asking for an allowance of $700 therefor. The petition was laid over until the final completion of the work. On March 16, 1885, the board of public works sent a communication to the council to the effect that it was their opinion that the contractor was entitled to extra pay for such work, and asking the council to adjust the claim. Accordingly an order was drawn in favor of Mr. Burnham for $700. In March, 1882, Rice presented claims for extra excavation at the curve, and extra brick, amount-

ing to $805.97, to the board, which were allowed and paid. There was also a bill for extra lumber, running from May 10th to December 10th, amounting to $816.66, which was also allowed and paid. On January 31, 1885, Burnham, in his own right and as assignee of Rice, presented a claim to the board for work on the straining chamber, in which he claimed $7,233.82 as his due, putting in lump sums for so much labor, lumber, and pumping. This, counsel claims, was presented merely as a compromise, and should not have been considered. It is only important as showing one of the gradations in the growth of this remarkable claim. We have been somewhat perplexed over the position assumed by plaintiffs' counsel. At the time the bill for extras at the curve was presented, before referred to, whatever right the contractor had for compensation had then accrued. The claim presented was not claimed to be in conformity to the terms or requirements of the contract. If his right to compensation for work so done had then ripened, just why it should have been parceled up, and only a part presented, is not easily seen. But, it is said, these bills are in the handwriting of Mr. Regan, a clerk in the office of the board. Just what significance is to be attached to that fact we are unable to determine. The claims were allowed, and the orders received by Crilley, presumably with knowledge of what they were for. If he was the real party in interest, he is chargeable with the consequences of the acts of his representative, Rice. He cannot accept the fruits of those acts, and afterwards surcharge his accounts and plead ignorance of the situation. If he is not bound by the requirements of the contract as to reporting claims for extras monthly, he certainly cannot parcel up and present his claims piecemeal. The board of public works were the arbitrators appointed by the contract to pass upon the claims for extras, and when they passed upon the matters submitted their finding is final. *Wheeler v. Van Houten,* 12 Johns. 311; *Kendall v. Stokes,* 3 How. 87; *McJimsey v. Traverse,* 1 Stew. 244.

It is idle to say that the board refused to act upon the plaintiffs' claims. They had repeated meetings together, and matters were talked over. There is absolutely no proof that the board ever refused to act upon the claim, and there could be none, because the claim had never been presented. If it be conceded that the requirement of the contract as to monthly claims for extras had been waived, that was no waiver of the necessity of submitting to them the actual demand. The board passed upon all demands submitted, and in their final adjustment went further, and recommended that a claim filed with the council be allowed.

This case is a striking example of the exceeding looseness with which municipal contracts are sometimes carried out. Contractual obligations rests very lightly when there is influence with the governing power. Whether the plaintiffs in this case might have been entitled to some greater allowance for extras than they received, had they placed themselves in a position to demand it, it is not our purpose to inquire. We simply pass upon the situation as presented, and do not hesitate to conclude that under no theory of the law or of the facts in the record can the plaintiffs' recovery be sustained. The defendant virtually admits that the plaintiffs are entitled to the $700 allowed by the council, and the sum of $4,787.48 found due by the board of public works. Orders for these amounts were tendered to the plaintiffs, but were refused. For these amounts the plaintiffs are entitled to judgment, with interest, unless there has been a tender of money, kept good under the rule, or a tender of judgment, which the record here fails to disclose.

*By the Court.*— The judgment of the superior court of Milwaukee county is reversed, and the cause is remanded with directions to enter judgment for plaintiffs and respondents in accordance with this opinion.