CONSOLIDATED WATER POWER COMPANY, Respondent, vs. NASH,
Appellant.

SAME, Appellant, vs. SAME, Respondent.

*February 6 — March 19, 1901.*

*Corporations: Officers: Authority to convey entire property: Contracts:
Arbitration: Signatures: Withdrawal: Mistake vitiating award:
Specific performance: Judgment.*

1. The president and secretary of an active manufacturing or business
corporation have no power to make a contract on its behalf for the
conveyance of its entire operating plant, without the sanction of
the stockholders in meeting assembled, especially when the con-
tract is also to subscribe for, and accept payment in, the stock of
another corporation.

2. Where a contract provides that it shall not be binding upon either
or any of the parties thereto until signed and executed by persons
and corporations named therein, any party has an option to with-
draw before the contract has been signed and executed by all of
such persons and corporations, and may effectively exercise such
option by notifying all the parties interested of his refusal to be
bound by the contract or to participate further in the scheme
contemplated thereby.

3. Where one of the signatures required by the terms of such contract
before it shall take effect is that of " C. as administrator of the
estate of B.," signature by C. in that form is sufficient, and an au-
thoritative execution on behalf of the estate of B. is not necessary
to make the contract effective.    [Whether, however, there is thus
created sufficient mutuality of effective obligation to warrant the
compelling of specific performance, not determined.]

4. Where the names of certain corporations had been signed to such a contract without authority, ratification of such signatures by the stockholders of the corporations after one party had exercised his option to withdraw could not affect the latter or create any liability against him.

5. The mistake which can vitiate an award of arbitrators is not a mistaken conclusion upon a question of fact or of law which they considered and decided, but an unconscious failure to know or apprehend some material fact or right, in the light of which their judgment should have been exercised.

6. Several owners of mill plants and of lands which would be affected by the improvement of the water power of a river agreed to convey their properties to a corporation formed to effect such improvement, and to accept in payment therefor such amount of the stock of said corporation as should be apportioned to each by a board of arbitrators. Construing such contract in the light of the situation and of other facts (more fully stated in the opinion) it is *held* that the apportionment of stock was to be made according to the money values of the various properties, and hence that an apportionment or award based solely upon the proportionate number of feet of fall in the river opposite each of the several properties does not embody any decision of the arbitrators upon the question submitted to them and is not binding.

7. The parties to said agreement being under no obligation to convey to the corporation until there had been a proper award by the arbitrators, it was error for the court, in an action by the corporation to compel specific performance by one of the parties, to determine the number of shares to which the defendant was entitled, in the light of the evidence as to market values, and to order a conveyance upon delivery of said shares.

APPEALS from a judgment of the circuit court for Wood county: O. B. WYMAN, Judge. *Reversed on both appeals.*

This suit, brought by the plaintiff to compel specific performance by the defendant of a contract to convey certain lands and water power in the Wisconsin river, near Grand Rapids, presented substantially the following facts, either undisputed or found by the court upon sufficient evidence:

In 1894 various interests in lands, riparian easements, and water powers existed in the vicinity of Grand Rapids and Centralia, which, however, utilized but a part of the power

of the water there flowing, of which further utilization and
development was also obstructed by the conflicting rights
of different owners.   On July 16th of that year some eight
or ten of these owners had prepared a written agreement
reciting the belief "that the water power at said cities
would be of more value if consolidated and improved upon
one general plan with reference to the value of the whole
water power," and declaring that they agreed with each
other to convey all their respective interests in lands, ripa-
rian rights, and water power, including dams, mills, mill
machinery, and personal property, specified in schedule, to
a corporation to be formed and to be called *Consolidated
Water Power Company*, "and to take in consideration of
such conveyance and for the same such share in the stock
of said corporation as shall be apportioned to each of us by
a board of arbitrators on account of our respective separate
interests and ownership in said lands, riparian rights, and
water power, and other property above specified."   Then
followed a description of the property and the names of the
arbitrators, and the contract continued:

"We agree to abide by the decision of said board of arbi-
trators, and to take such amount of stock in said corporation
as such board shall award to each of us on account of our
conveyance of our interest in said properties.   .   .   .   The
conveyance to be made in execution of this agreement shall
be made when called for by the company to be formed.
.   .   .   The said board of arbitrators shall place a separate
valuation upon the water wheels, shafting, machinery, and
mill buildings, and personal property of each of the under-
signed, not including the foundation."

Each was to have option to remove such property within
a limited time, "the same to be kept by him at the valua-
tion fixed upon the same by the board of arbitrators."   The
proposed agreement concluded:

"This agreement shall not be binding upon either or any
of the parties thereto until it is signed and executed by the
following named persons and corporations, to wit, W. E.

Mack and C. A. Spencer, *Thomas E. Nash,* and John L. Nash, B. G. Chandos and B. G. Chandos as administrator of the estate of Marian L. Bensley, deceased, the Wisconsin Wood Pulp Company, the Grand Rapids Water Power Company, and the Pioneer Wood Pulp Company, F. Mac-Kinnon, and C. A. Spencer; and when so signed and executed the same shall be binding upon each and every one of said parties and their respective legal representatives, heirs, successors, and assigns."

This writing was signed by all the individuals mentioned in said last paragraph, and to it were subscribed the names of the Wisconsin Wood Pulp Company, by W. E. Mack, secretary, and C. A. Spencer, president, Grand Rapids Water Power Company, by C. A. Spencer, secretary, and F. Mac-Kinnon, president, and Pioneer Wood Pulp Company, by F. MacKinnon, secretary, and Geo. E. Hoskinson, president; such signatures being made by the respective officers without any authority from the stockholders of the respective corporations in meeting, and without any authority from directors of the Grand Rapids Water Power Company.

On July 28th following, a number of the signers of that agreement executed formal articles of incorporation of the *Consolidated Water Power Company,* and caused the same to be filed, and a certificate to be procured from the secretary of state; but no further steps were presently taken towards organizing or launching such corporation. On February 13, 1895, the above-named arbitrators called together all of the individuals whose names are subscribed to the agreement of July 16, 1894, and announced their award, together with the basis on which the same had been made. At that time the defendant and his brother, John L. Nash, who was then associated with him in the ownership of the property now in litigation, being dissatisfied both with the result of the said award and with the conduct of the arbitrators, announced that they withdrew from the agreement of July 16, 1894, and would proceed no further with it. Notwith-

standing this announcement, an attempt was made on the 20th of February to hold a meeting of all the subscribers to that agreement as a meeting of stockholders to organize the plaintiff corporation, notice being served on defendant and his brother. They attended at the time of that meeting, and reiterated their declaration that they repudiated and withdrew from the agreement of July 16, 1894, whereupon they left the room, and thereafter had no participation in any further proceedings of the plaintiff corporation or of its members. Quite immediately thereafter attempted subscriptions to the capital stock of the plaintiff corporation by the other signatories were had, and attempted conveyances of the various parcels of real estate, the conveyances by the three signatory corporations being executed without express authority of any stockholders' meeting. At some later date — apparently without formal action — the capital stock of the plaintiff, which was issuable to these three corporations, was distributed among their stockholders except as to one stockholder in the Pioneer Wood Pulp Company, to whom none was ever distributed, and who is not shown to have participated personally in any of the proceedings. The title of the property of the Bensley estate never was attempted to be transferred by the administrator, but under a mortgage foreclosure judgment standing against it a sale was made, and the property bid in by a stranger to the record, and by him conveyed to the plaintiff, and stock issued to him therefor.

On June 15, 1895, suit was commenced by the plaintiff against the defendant and his brother, John L. Nash, for specific performance, and to compel conveyance of their property in accordance with the agreement of July 16, 1894. On the trial of that action it transpired that the title to the Bensley estate property was incomplete, and the plaintiff, on the 30th day of October, 1895, took a judgment of nonsuit without prejudice. Thereafter attempts were made to

perfect the Bensley title, which terminated as early as June 29, 1897. No intimation was given to the defendant or his brother of a purpose to insist further on their liability to convey their property. On the 18th of April, 1899, the defendant purchased his brother's half interest therein for $9,500. On June 17, 1899, the mill and machinery were destroyed by fire, and insurance to the extent of $5,500 paid to the defendant, and he was negotiating for the erection of a paper-bag factory on the property, when he was interrupted by the commencement of the present action.

Additional facts relevant to the questions decided will be found in the opinion. The judgment repudiated the award of the arbitrators as not in accordance with the submission to them, and as fixing an inadequate price or proportion for defendant's property, and decreed specific performance, requiring, however, that the plaintiff deliver to the defendant 342 shares of its stock, instead of the 135 shares apportioned to him by the appraisers. From the whole of this judgment the defendant appeals, and from that portion requiring the delivery of 207 shares of stock in addition to the award of the appraisers the plaintiff appeals.

*Geo. L. Williams,* attorney, and *B. W. Jones,* of counsel, for the plaintiff.

*B. R. Goggins,* attorney, and *W. F. Vilas,* of counsel, for the defendant.

DODGE, J. The defendant on his appeal contends that he never became bound by the alleged contract of July 16, 1894, for the reason that he withdrew at a time when he had a right so to do, and before the contract had become complete and obligatory upon him. That contract, by its very terms, provided that it should not be binding upon either or any of the parties thereto until signed and executed by a list of persons and corporations named. Obviously it was an incomplete instrument until that clause was

satisfied.  Until then none of the parties was irrevocably committed to his decision to become a party to that agreement.  It was ambulatory, and, up to the time when the last of the parties named had signed and executed, each of the others had a right to change his mind and withdraw his assent thereto.  This proposition is not controverted by either party; as, indeed, it could not well be.

Thereupon arises the inquiry whether, on the 13th day of February, when the defendant exercised his election to withdraw, and gave notice of such decision to all of the interested parties, the contract had been signed and executed by all those named.  On that date there had been subscribed to the paper the names of all such parties, including the name of B. G. Chandos as administrator of the estate of Marian L. Bensley, and the names of the three corporations the Wisconsin Wood Pulp Company, the Grand Rapids Water Power Company, and the Pioneer Wood Pulp Company, in the form described in the statement of facts.  The defendant contends nevertheless that it had not in fact been executed by any of the four.  With respect to the Bensley estate, we think the defendant's position not well taken, for the purposes, at least, of the present question.  The paper was to take effect, according to its terms, when signed and executed, not authoritatively on behalf of the estate of Marian L. Bensley, but "by B. G. Chandos as administrator."  The parties had a perfect right to agree to accept Mr. Chandos's signature as satisfying the conditions upon which the contract should become effectual, assuming, or taking the chance, that, if he so signed, he would be able to effect a conveyance of the property of the estate.  These views are expressed merely with reference to the efficacy of his signature to bring the paper into existence as a contract. Whether thereby was created sufficient mutuality of effective obligation to warrant specific performance need not now be discussed.

As to the corporations, however, a different situation exists. It is shown that in each case the agreement bound substantially the entire plant of each of the three manufacturing corporations, leaving them substantially no property with which to do business. It is shown that one, at least, would be deprived of all property except bills and accounts receivable. It is not indicated that they were other than going, active corporations. The subscribing of the corporate names to this document by the president and secretary of each was done without any showing or pretense of actual authority either in by-laws or vote of stockholders, except that in the case of two there were votes of directors authorizing or ratifying the execution of the agreement.

It is a fundamental principle of the delegation of power and authority that the principal does not act at all when the delegatee's act is outside of the power conferred. For safety, this principle, of course, yields to meet cases of apparent authority and of ratification, of which, however, nothing existed on February 13, 1895. *Ford v. Hill,* 92 Wis. 188. If it was not within the authority of the president and secretary of either of these corporations to enter into this contract on behalf of the corporation, or to affix the corporate seal thereto, then the same had not been signed and executed by that corporation. The authorities seem to be unanimous to the proposition that it is not within the general power of president and secretary, nor probably even within the power of the board of directors, to convey away the entire manufacturing plant of a going corporation. The principle is that such act is not in the line of any business contemplated to be done by the corporation, it being in its essence the very negation of corporate business. 4 Thomp. Corp. §§ 4632, 4951; *Walworth Co. Bank v. Farmers' L. & T. Co.* 14 Wis. 325; *Northwestern F. Co. v. Lee,* 102 Wis. 426, 429; *Calteaux v. Mueller,* 102 Wis. 525, 529; *Stokes v. N. J. P. Co.* 46 N. J. Law, 237; *Tappan v. Warren F. C. S. Bank,*

127 Mass. 107; *Goodyear R. Co. v. George D. Scott Co.* 96 Ala. 439, 443.

So far as any light is thrown upon the subject by our statutes, the limitations on the power of officers over such conveyance are quite as restrictive as above suggested. By sec. 1748, Stats. 1898, corporations are restrained from mortgaging their entire plant except by consent of a majority of the stockholders. Sec. 1767 provides that the property of any corporation shall be used only for the purposes prescribed by its articles of association. By sec. 1775 a corporation is given the powers " necessary or proper to conduct the business or accomplish the purposes prescribed by its articles, but no other or greater; and may take by gift, devise, purchase or otherwise, and manage and hold, and may, *by a vote of a majority of the stock* given at any regular meeting or at any special meeting duly called for the purpose, sell and convey or authorize to be conveyed all or any portion of the property owned by it. . . . But no such corporation shall take or hold stock in any other corporation except upon and with the assent of the holders of three fourths of the capital stock of both the corporation proposing to take such stock and the corporation in which it is proposed to be taken." In the light of such restrictive provisions, we cannot doubt that an act so remote from the ordinary business of any manufacturing or business corporation as the disposal of its entire operating plant must have the sanction of the stockholders in meeting assembled, and that it is wholly beyond the power of the president and secretary to make a contract for such conveyance on behalf of the corporation without such authority; especially when, as here, it is a contract, not only to dispose of the plant, but, by the same instrument, to subscribe for and agree to accept payment in stock of another corporation.

We are constained to the conclusion that on February 13, 1895, the so-called contract of July 16, 1894, had not been

signed and executed by the three corporations whose names had been affixed thereto without authority, and that *locus penitentiæ* still remained for Nash & Nash to withdraw at their option; that they did so in an effective manner by notification to all of the parties interested of their refusal to be bound by the contract or further participate in the scheme contemplated thereby; and that, as to them, said instrument never became a binding contract.

Plaintiff argues that, although these corporations had not executed the agreement, all of their stockholders subsequently ratified it by assenting to conveyance of the real estate specified, and by individually accepting the capital stock of the plaintiff corporation. Even that fact is not established with reference to the Pioneer Wood Pulp Company, for it is shown without controversy that Mrs. Hoskinson was a stockholder therein, and that she never did receive any of the stock in the plaintiff company, and there is no evidence that she ever had knowledge either of this agreement or of a conveyance in pursuance thereof. But all such discussion is apart from the question now under consideration, for the ratification, if any, did not take place until after Nash & Nash had exercised their election not to be parties to the agreement, and could not, therefore, serve to create an obligation which the defendant and his brother had never assumed.

2. It is also contended by the defendant that, even if he and his brother were bound by the contract of July 16, 1894, the three arbitrators therein named have never, in accordance with that instrument, apportioned the share in the contemplated corporation to which defendant and his brother were entitled as consideration for a transfer of their property. The argument upon this contention took a much wider range than is necessary for its decision. By the finding it is declared without exception that the arbitrators made their apportionment "by awarding to the several prop-

erties covered by said agreement of July 16, 1894, shares of the whole water power which they estimated could be produced and developed upon the river by the construction of a dam in proportion to the number of feet of fall in the river opposite each of the several properties, in the award of water-power value to such properties, and entirely disregarded the real market value of the same, except in reckoning wheels, machinery, and personal property." Whether this was a performance of the duty and authority committed to them depends first, of course, on the agreement of July 16, 1894, in the light of the situation and objects surrounding the making of it. The situation was the existence of a rapid and voluminous river, with a fall of some thirty feet in two and one-half miles above the business part of the now city of Grand Rapids, which, partly at least for the community's welfare, it was desired to develop; the existence of numerous mill plants equipped with water wheels, buildings, and machinery, doing considerable business, and having some measure of water head already established by wing dams, etc., and with tail race and escape facilities, located on land differing widely in sale values because of proximity to business parts of the city, to streets, or to railroads; and the existence of other lands on or near the river, varying from that available for mill plants or building lots to low-lying stump lands worth five dollars per acre, nearly or quite unavailable for any use, but likely to be flooded in any comprehensive effort to develop the water power. In this situation the parties, being owners of probably the major part of lands to be affected, and having in their several ownership all the varieties above outlined, entered into agreement to effect a general plan involving the damming of the river, with all the results of flooding some lands, destroying or impairing some sites and water powers, and greatly improving others, by organizing a corporation with power to develop the water power for the purpose of selling or leas-

ing, but not to own or operate mills and factories. To this end it was and would be necessary for such corporation to acquire by purchase or condemnation either the real estate to be affected by their enterprise or rights therein likely to be impaired. As a considerable nucleus of the property and rights so necessarily to be acquired, the parties proposed to convey what they owned without condemnation, and to accept pay in stock of the corporation. That was the essence of the agreement,— that each would sell for stock, instead of money.

In this situation, and upon such reasons and purposes, they stipulated as to a method of fixing the price of their respective properties by the written contract of July 16, 1894, in the terms set forth in the statement of facts. That contract provides that each shall accept as price "such share in the proposed corporation as shall be apportioned to him by the arbitrators." Does that mean to commit to that board authority to apportion according to whim or caprice, or according to *some* standard of proportion or relation? Hardly the former, for the result were too absurd for contemplation by business men dealing with property of actual value. If that be the construction, a simple division of the whole stock by seven, and apportionment of one seventh to each, would have bound them, although the properties vary in value from $1,600 to $35,000. Or even a lottery scheme, by which the grand prize of half the stock might be awarded to the owners of the $1,600 property, would be within the submission. Such purpose is not supposable. Some standard must have been contemplated and intended to control the apportionment. That being so, the standard contemplated cannot be in doubt. There is but one in any wise consistent with the situation, or with the provisions of the contract itself, and that is the standard of the money value of the real estate to be conveyed. This is primarily apparent from the contract itself, for, after

Consolidated Water Power Co. vs. Nash.

deciding the portion of stock which each was to receive, the
arbitrators were to place a "separate valuation" on part of
it, namely, the buildings, machinery, etc., which the owner
might retain, deducting such valuation from the stock ap-
portioned for his entire property; thus presenting the im-
possible mathematical problem of subtracting money value
from feet fall of water, or some other commodity, if the
general apportionment were not also according to money
value.

Again, the contract required each owner to take the
awarded share of the corporation in capital stock, which by
law can issue only on the basis of money value. Still again,
as confirmation of the meaning of all the parties, it is in
evidence that in arranging the corporation they each fixed
an estimate of *value* on their respective properties, which
was assumed as the probable approximate amount of stock
at par which would be distributed among the original con-
tractors; and the total stock was made enough larger to
supply a further quantity to be sold for money with which
to build dam and pay other expenses,— a wholly unfeasible
project if the signatories' properties were to be turned in
without any relation to money value.

Further, it is apparent from the situation and the objects
in view that a basis by which property was to be acquired
by the corporation with regard only to foot fall of river ap-
purtenant to it would never have been assented to by those
owning small, but valuable, properties. One hundred and
sixty acres of stump waste land, having half a mile of river
frontage and many feet fall, could be acquired by purchase
(perhaps by condemnation) for a mere fraction of the cost
of a valuable piece of mill property in the business part of
the city, though the latter have but a few rods frontage and
a few inches river fall contiguous thereto. It is too unrea-
sonable for belief that the owners of the latter would enter
into a corporation bound in advance to purchase the former

class of properties at many fold the price at which it could be condemned or purchased.

We cannot avoid the conclusion that the clear and obvious construction of the contract between the parties defines and limits the submission to the arbitrators to an apportionment according to the money values of the various properties, and the question is whether the award can, in any reasonable sense, be considered a decision within that submission. . Can it be said that the arbitrators have exercised or attempted to exercise their judgment upon the question submitted to them? If it can, their award must stand as fixing the price of each parcel just as fully and finally as if the amount fixed by them had originally been agreed on by the parties and written into their contract,— subject, of course, to impeachment of the award for fraud, misconduct, or mistake. We may freely concede that the award is none the less binding because the arbitrators have erred in judgment upon any question of fact or law submitted to them for judgment. Such errors are among the contingencies which parties assume when they select such tribunals. The mistake which can vitiate an award is not a mistaken conclusion upon facts or law which are considered and decided upon, but an unconscious failure to know or apprehend some material fact or right in the light of which their judgment should have been exercised. To these propositions decisions from other courts hardly need to be cited. Our own are clear. *Early v. Chippewa L. Co.* 68 Wis. 112; *Wood v. Treleven*, 74 Wis. 577; *Stubbings v. McGregor*, 86 Wis. 248; *Wendt v. Vogel*, 87 Wis. 462; *Burnham v. Milwaukee*, 100 Wis. 55, 67; *McAlpine v. St. Clara F. Academy*, 101 Wis. 468; *John Pritzlaff H. Co. v. Berghoefer*, 103 Wis. 359, 364. But when arbitrators fail to decide the question submitted to them they indeed make no award. Parties who agree to submit their rights to the judgment of any tribunal upon a specified question or conditions cannot be affected by its views on other and different

ones. *Early v. Chippewa L. Co.* 68 Wis. 117; *Stubbings v. McGregor,* 86 Wis. 252; Morse, Arbitration, 259; *Allen v. Galpin,* 9 Barb. 246; *Gear v. Bracken,* 1 Pin. 249. It matters little what designation be given such procedure as here presented,— whether it be termed a departure from the submission, a mistake in supposing a wrong standard or measure to be the correct one, or misconduct,— the result is the same, and their so-called "award" is as if not made.

The conclusion from the foregoing is obvious and inevitable. Having agreed only to be bound by the judgment of the arbitrators as to the relative money value of the various properties, the defendant is not bound by nor concerned in the result of their judgment as to the proportion of feet fall, nor even of estimated water power physically appurtenant to each. Had the arbitrators, in the exercise of their judgment, concluded that the money value of each property was in fact measured by its appurtenant horse power, erroneous as such view would be, a different situation would be presented; but they have not done this, as appears by the finding, and even more clearly by some of the testimony. They allowed to each property the number of feet fall of the river adjoining its frontage, which they computed into proportionate horse power upon a basis of assumption of total horse power, the correctness of which they did not decide, as they were seeking only proportions; then multiplied the horse power by $25, to ascertain the par value of stock to be apportioned. The $25 was adopted arbitrarily and without considering whether it even approximated the money value. One of the arbitrators testified that they might just as well have used $100 as the multiplier, as it would have preserved the relative proportions. This method is illustrated and emphasized by many other facts in the record, recitation of which is not necessary. They only serve to sustain and illustrate the finding and to confirm the conclusion that the so-called "award" embodies no decision by the arbitrators upon the question submitted to them.

We are therefore led, necessarily, to hold that plaintiff has failed to show even any legal obligation resting on defendant to convey his property to it, for that he never became bound to the alleged contract of July 16, 1894, and for that the share in the plaintiff corporation, upon tender of which in capital stock his property was to be conveyed, has never been determined by the arbitrators, within the terms of that agreement   Judgment dismissing the complaint must be directed on these grounds, and we need not discuss the very numerous and cogent equitable considerations which defendant urges against the enforcement of specific performance.

3. On plaintiff's appeal our attention is drawn to a portion of the judgment which we are quite willing to believe is without precedent, as counsel assert, and which finds no apologist on either side.   After reaching the conclusion that the award was not such as the defendant was bound to accept, and that no obligation rested upon him to convey for the consideration so ascertained, the court proceeded to fix a price with apparently no justification save that deemed reasonable in light of the opinion evidence as to market values, and to decree specific performance upon payment of 342 shares of stock, instead of the 135 shares fixed by the arbitrators.   It is an imperative condition of the equitable jurisdiction to decree conveyance in specific performance of a contract that there should be at least a legally binding contract to convey.   The only contract attempted to be proved was one to convey at a price to be fixed by arbitrators.   Until such price had been fixed, there could be no obligation, either on the one side to convey, or on the other to receive, upon any terms.   Neither had the defendant agreed to sell, nor the plaintiff to purchase, at any other price, be it reasonable value, or assessed value, or a value to be ascertained by the court.   If the written contract did not bind according to its terms, it did not bind at all.   In such

a situation, even a court of equity cannot attempt so daring a flight as the making of a contract between the parties and compelling them to specifically perform it. Such was the effect of the portion of the judgment requiring the delivery of 342 shares of stock as condition of defendant's conveyance, which, therefore, is clearly erroneous, and must have caused reversal had the plaintiff only appealed.

*By the Court.*— Judgment reversed on both appeals, and cause remanded with directions to enter judgment dismissing the complaint. In taxing plaintiff's costs on its appeal, not more than $25 will be allowed for printing.

BARDEEN, J., took no part.