ESTATE OF WELLS.    (Five appeals.

*October 31, 1913—March 17, 1914.*

(1-4, 10) *Wills: Trusts: Construction: "Net income:" Division of receipts between income and* corpus *of estate: Powers of executors and trustees: Dividends on corporate stock: Earnings added to surplus: Discretion of directors: "Capital invested" and capital stock.*   (5, 6) *Apportionment of fees and expenses: Value of services: Opinion evidence not binding on court.* (7, 8) *Bonds bought or held at premium: What part of interest is net income: Sinking fund.*   (9) *Final accounting of executors: Questions considered: Appeal to circuit court.* (11, 12) *Guardians* ad litem: *Compensation: Excessive allowances.*

1. A will, which clearly evinced the intent of the testator that the principal or *corpus* of his large estate should be carefully conserved and kept intact for many years after his death, devised the estate to executors and trustees to hold during the term of two lives and nineteen years thereafter, and vested in such trustees unusually broad and comprehensive powers.   Among other things, it directed them to pay over the "net annual income" of the estate to certain beneficiaries, and further directed that in determining such income for any year "only such portion of any dividend received upon any stock in any corporation belonging to my estate, shall be considered as the income of my estate as shall be paid by such corporation out of its net annual earnings for that year, and that all such portions of any dividend received upon any such stock as shall be paid by such corporation from the sale of its property, shall be considered by my said executors and trustees, respectively, as principal and as merely a division among the stockholders of the property of the corporation."   Testator further directed that the judgment and decision of said executors and trustees "shall be final in ascertaining how much of every dividend received upon any shares of capital stock shall be considered as income received from the profits of the corporation for that year upon the capital invested," and that "only such portion of any dividend as shall be determined by my said executors or trustees, respectively, to be the annual profits of the corporation for that year upon its capital invested, shall be paid out as the net annual income for that year of my estate or of any share thereof," and that the portion of any and every dividend determined by said executors or trustees to be the proceeds of the sale of the

property of the corporation shall be reinvested by them, as a mere change in the form of the investment of that portion of the estate. *Held*, that the corporations referred to were not corporations which the executors were by the will directed or authorized to create, but were corporations in which the testator owned stock at the time of his death; that the words "capital invested" did not mean capital stock, but the property or means of the corporation; and that the direction as to division of dividends was not limited to cases where the corporation had made sale of some large portion or the whole of its property and had formally or practically divided the proceeds among the stockholders.

2. Where a testator establishes a trust in corporate stock for the benefit of a life tenant, with remainder over to another, dividends on the stock which are not paid out of the earnings but are really divisions of the capital of the corporation constitute a part of the principal of the trust and should not be treated as income, unless the testator intended that they should be so treated.

3. The *capital* of a corporation is the property or means which the corporation owns, and it may vary in amount, while the *capital stock* is fixed, and represents the interests of the stockholdholders and is their property.

4. Under the provision of the will above stated, the determination of the executors and trustees as to the apportionment of dividends between income and *corpus* of the estate must be deemed final and conclusive on every beneficiary, in the absence of bad faith, fraud, or mere arbitrary action.

5. The fees and expenses of the executors in matters relating purely to the administration of the estate being properly chargeable to *corpus*, and their fees and expenses as trustees in the management of the trust property being properly chargeable against the income, the apportionment of such fees and expenses made by the trial court is affirmed, not being against the preponderance of the evidence.

6. As to the value of the services of the executors and the proportionate amount chargeable against the two funds, the trial court was entitled to exercise its own judgment and was not bound by the testimony of witnesses.

7. Where a trust is created in funds of which the income is to be paid to certain beneficiaries for life and the principal to others on the termination of the life estate, and the trustees invest a part of the funds in securities at a premium, the trustees should take from the annual income and add to the *corpus* such sum as will under established rules at the maturity of the

securities repay to the *corpus* the amount paid as premium, and pay to the life tenant the balance only of the annual income.

8. Whether there is any logical difference in the rules of law which should apply to securities held by the testator at a premium and to securities purchased by the executors at a premium, is not decided in this case. It being clear that the testator intended primarily that the principal or *corpus* of the estate should at all hazards be preserved intact, it is *held* that, as to both classes of securities above mentioned, sinking funds were properly created by setting aside a portion of the annual interest received thereon, and that such sinking funds should remain in the *corpus* of the estate notwithstanding the subsequent sale of some of the securities at a price which left a small balance in the sinking fund.

9. In a proceeding for the settlement of the final account of executors, the whole subject of their handling of the estate is open for consideration in the county court and also, *de novo*, upon appeal to the circuit court; hence the mere fact that certain matters properly within the scope of the proceeding were not suggested or considered in the county court does not preclude consideration thereof and action thereon in the circuit court; and no special petition for consideration of such matters is necessary.

10. Courts will not, in the absence of fraud, bad faith, or wilful abuse of discretionary power, interfere with the discretion of corporate directors and compel the declaration of a dividend; hence, although in this case the executors as individuals owned stock in certain corporations, which together with the stock owned by the estate constituted a majority of the stock, and did not compel an annual distribution of the earnings of such corporation but permitted such earnings to be added to the surplus account, thus enhancing the value of the stock, the court should not, in the absence of bad faith or fraud, surcharge the executors' account by taking from the *corpus* of the estate the amount of such enhancement and treating it as income.

11. Guardians *ad litem* are public officers of justice. Their work is primarily and chiefly the performance of a duty imposed by the court upon its own officers to aid it in the administration of the law; and the "compensation" which, under sec. 4041b, Stats., may be allowed to them means a reasonable charge, not measured by the high salaries or rewards for services which large establishments and wealthy clients may voluntarily pay to lawyers of their choice, but measured more nearly by the

compensation which the law allows to public officers having similar duties.

12. Allowances to guardians *ad litem* in this case amounting to about $33 per day for days spent in court, and $17.50 per day for days spent out of court, are *held* to be too large by about fifty per cent.

APPEALS from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Modified and affirmed.*

There are in this case five separate appeals from a judgment of the circuit court allowing the final account of the executors of the will of Daniel Wells, Jr., and assigning the estate to said executors in their capacity as trustees under the will. The judgment modified in certain respects the judgment of the county court and affirmed it as so modified. The executors appeal from certain provisions of the judgment, and certain of the beneficiaries appeal from other provisions thereof.

The will in question was before this court for construction in the case of *Stephenson v. Norris,* 128 Wis. 242, 107 N. W. 343. Many of the provisions of the will are there stated and so far as possible repetition of them will be avoided. Mr. Wells possessed a very large estate, running well up into the millions, and he desired to have the principal kept together in the hands of trustees for a long period. He devised practically his entire estate to *Isaac Stephenson, Horace A. J. Upham,* and Charles F. Ilsley (their survivors and successors in trust), to hold the same during the life of his daughter, Fannie Wells Norris, and her son, *Daniel Wells Norris,* and nineteen years thereafter (with a certain exception immaterial here). He directed his executors to divide the estate into eighty-one shares, convert the same into money, organize corporations if they deemed best and hold the shares during the trust period, and pay over the net income thereon to certain beneficiaries, many of whom were then and now are

minors, and some of whom are appellants in this action. The names of the various beneficiaries of the trusts so created, with their respective shares, are given in the statement preceding the opinion in the *Stephenson Case, supra,* and need not be repeated here. At the close of the trust period the principal of the trust estate was to be paid to certain beneficiaries or classes of beneficiaries named in the will. The estate was to be divided into the eighty-one shares within five years after the death of the testator (that death took place March 18, 1902), but the executors and trustees were authorized and directed to pay the net annual income of the estate quarterly to the beneficiaries of the income before the actual division of the estate into eighty-one parts in such shares as they would have been respectively entitled to receive had the division been made immediately after the testator's death. Very large discretionary powers were given to the trustees and executors as to the division of the property among certain classes of the beneficiaries, even to the extent of withholding shares entirely if the particular beneficiary should be deemed by them unworthy or incompetent to receive or manage the same. These provisions are fully set forth in the statement of the *Stephenson Case, supra.*

The will contained the usual directions that the executors were to pay the testator's debts, funeral expenses, and the expenses of administration, also a bequest of $150,000 to the executors who should qualify and act. The provisions of the will which have the greatest bearing upon questions raised by the present appeals are as follows:

"*Item twenty-second.* I direct that my said executors and trustees, the survivors and survivor of them and their successors in trust shall be allowed a reasonable sum for their compensation, to be paid to them yearly from my estate and for their expenses and for the employment of agents in the proper management of my estate and the trust funds committed to their care, and I do hereby declare that the sum bequeathed to my said executors by item fourth of this will is not intended to be in lieu of other proper compensation.

"In determining the net annual income of my estate and
of any share or part thereof, I direct my said executors and
trustees, the survivors and survivor of them and their respec-
tive successive successors in trust, respectively, to deduct
from the income of the year all expenses of every kind in-
curred by them in the management and care of my estate,
including repairs, improvements, assessments, taxes and other
disbursements thought best by them to be made to protect, to
improve, to make valuable or to preserve the same; provided,
however, that said executors and trustees, the survivors and
survivor of them and their respective successive successors in
trust, respectively, shall have the right, in determining the
net income of my estate and of any share or part thereof, for
any one particular year, to distribute any extraordinary ex-
pense or disbursement over a series of years, as said executors
or trustees, the survivors or survivor of them or their respec-
tive successors in trust, respectively, shall deem advisable. I
authorize my said executors and trustees, the survivors and
survivor of them and their respective successive successors in
trust, respectively, to employ such agents to assist in the man-
agement and care of my estate and carry out the terms of this
will as they, respectively, shall deem best, and to pay them a
reasonable compensation.

"*Item twenty-third.* In determining the net annual in-
come of my estate for any year while in the hands of my said
executors and of any portion in the hands of my said trustees,
I direct that only such portion of any dividend received upon
any stock in any corporation belonging to my estate, shall be
considered as the income of my estate as shall be paid by such
corporation out of its net annual earnings for that year and
that all such portions of any dividend received upon any such
stock as shall be paid by such corporation from the sale of its
property, shall be considered by my said executors and trus-
tees, respectively, as principal and as merely a division among
the stockholders of the property of the corporation, and I di-
rect that the judgment and decision of my said executors and
trustees, respectively, shall be final in ascertaining how much
of every dividend received upon any shares of capital stock
shall be considered as income received from the profits of the
corporation for that year upon the capital invested, and I di-
rect that only such portion of any dividend as shall be deter-
mined by my said executors or trustees, respectively, to be the
annual profits of the corporation for that year upon its capital

invested, shall be paid out as the net annual income for that year of my estate or of any share thereof, and that the portion of any and every dividend that shall be determined by my said executors or trustees respectively, to be the proceeds of the sale of the property of the corporation and as a division thereof among its stockholders, shall be reinvested by my said executors and trustees, respectively, as a mere change in the form of the investment of that portion of my estate."

The executors proceeded to administer the estate, divide the same into eighty-one parts as directed, and to carry out the trusts created by the will, making quarterly payments of net income as determined by them to the beneficiaries as directed by the will. Prior to the expiration of the five-year period, they filed their final account as executors, which covered not only the administration strictly so called, but all their transactions as trustees. That account is under consideration in the present case.

*Glenway Maxon,* for the appellant *Daniel Wells Norris.*

For the executors there were briefs by *Alfred L. Cary* and *William E. Black,* and oral argument by *Mr. Black.*

*Frank B. Van Valkenburgh,* guardian *ad litem,* for the appellants and respondents *Alice Agnes Pratt* and others.

*John F. Harper,* guardian *ad litem,* for the appellants and respondents *Sumner W. Parker* and others.

For the appellants and respondents *Andrew Comstock Dickson* and others, the cause was submitted on the brief of *Guy D. Goff,* guardian *ad litem.*

*George D. Van Dyke,* guardian *ad litem,* for the respondents *Mabel Decker Ferguson* and others.

The following opinion was filed December 9, 1914:

WINSLOW, C. J. When this will was before us for construction upon the former appeal (*Stephenson v. Norris,* 128 Wis. 242, 107 N. W. 343), the following language was used

in the opinion with respect to the general scheme and purpose of the testator:

"There can be little or no doubt as to the general character of that scheme. The testator was a man of great wealth. He evidently viewed his estate as a great business enterprise, an entity which he desired should be kept substantially intact for many years after his death. He therefore placed it in the hands of trusted persons with the most full and carefully specified powers, for the benefit, ultimately, of his father's descendants. His desire that it should remain an entity, presumably as a great corporation, with the beneficiaries as stockholders, is very apparent. The duration of the trusteeship as contemplated might be well towards a century. Many of the ultimate beneficiaries were yet to be born, and of their character or abilities he could know nothing, and so, in order to conserve the property, save it from dissipation by unknown beneficiaries, and insure its enjoyment by the members of his father's family, with due regard to their various needs and abilities, he evidently intended to vest unusually broad and comprehensive powers in his trustees and their successors."

The re-examination of the provisions of the will which we have been compelled to make upon the present appeal has not changed in any respect our estimate of the testator's intentions, but rather tended to confirm the conclusions then expressed. Those conclusions may perhaps be said to be the keynote, not only of the former decision, but of the present.

There are many assignments of error, but we do not find it necessary to state them in detail. Many of them involve the same question and the remainder may be classified into a few general groups, and the propositions involved may be treated abstractly rather than concretely.

The most important questions arise under item 23 of the will, and relate to the division of the dividends received from various corporations. The executors at the end of each year of their administration divided the dividends received by them during the preceding year from certain of the corpora-

tions in which the testator held stock, and credited a part of such dividends to the legatees named in the will as beneficiaries of income (hereinafter called the life tenants), and credited the balance to the *corpus* of the estate. They did this under the authority given them, as they supposed, by item 23 of the will, which directs that only that part of corporate dividends shall be considered as income which shall be paid out of the net annual earnings of the corporation for the year, and that any dividend paid out of the sale of corporate property shall be reinvested and added to the *corpus* of the estate.

It will not be necessary or useful to make any detailed or exact statement of these various transactions. Mr. Wells owned large amounts of stock in various lumbering and mining corporations at the time of his death, from which his executors received very large dividends during the accounting period. One of the lumber companies (the H. Witbeck Company) was closing out its business during that time, while another (the N. Ludington Company) was largely reducing its acreage of timber lands by extensive cutting of timber and manufacturing and selling the same. The executors each year determined what percentage of the dividends received by them from the various corporations was really income and what percentage represented sales of corporate property, and withheld the latter percentage from the life tenants, and added the same to the principal or *corpus* of the estate. In the case of the Homestake Mining Company there was an equal division between *corpus* and income; in the case of the lumber companies named, as well as some others, the percentage credited to principal was very largely in excess of the percentage credited to income.

It is admitted that in making these divisions the executors acted in good faith, but it is claimed on the part of the life tenants that they possessed no authority to make any such division, and that even if they had such authority they acted

upon wrong valuations and mistaken conceptions of their powers.

In support of these contentions it is first said that the corporations referred to in item 23 of the will are the corporations which the executors are directed or authorized to create by the terms of the will, and not the corporations in which Mr. Wells owned stock at the time of his death. We reject this contention without discussion. It is perfectly apparent to our minds that this is not what the testator meant.

It is next argued in substance that the words "capital invested" mean capital stock, and not the property or means of the corporation, and that the direction as to division of dividends only applies when a corporation has sold some large portion or the whole of its property and has made, either formally or practically, division of the proceeds of the sale among the stockholders. We deem this contention also untenable and will briefly state the considerations which lead us to this conclusion.

The intent of the testator to carefully conserve and keep intact the principal or *corpus* of his magnificent estate during the entire trust period is apparent in almost every line of the will. He was manifestly proud of this great creation of his own industry, and he felt that desire to have it perpetuated as a great business enterprise and an enduring monument to his own memory that many men similarly situated seem to have. The income was very large and every beneficiary would be very generously treated under any theory of the provisions of the will. Mr. Wells was a lawyer himself, and the will bears evidences of having been drawn with the utmost care by an experienced lawyer. If it was meant that the executors were to make a division of corporate dividends only when the corporation had made sale of its property and formally or practically divided the proceeds among stockholders, it would have been very easy to say so, and indeed there would, in that case, have been little need of the elaborate pro-

visions for the exercise of judgment on the part of the executors. Not only this, but it is to be remembered that there is a well established legal principle that, where a testator establishes a trust in property for the benefit of a life tenant with remainder over to another, and the property is of a wasting nature, such as mining stock or land stock, the dividends on which represent in part a practical diminution of corporate assets, in the absence of a clear expression of the testator's intention to the contrary the life tenant will be entitled to receive only the current rate of interest on the value of the trust property, and the remainder of the dividends will become a part of the principal of the trust fund, to be invested anew by the trustee. Lewin, Trusts (8th ed.) pp. 298–300; Loring, "A Trustee's Handbook" (3d ed.) p. 126.

The principle is sometimes stated thus: "If dividends are not paid out of earnings, but are really divisions of the capital of the corporation, they constitute a part of the principal of the trust and should not be treated as income in the absence of a contrary intention of the creator of the trust." Howes, Am. Law Relating to Income and Principal, p. 17; *Heard v. Eldredge,* 109 Mass. 258.

The careful provisions of item 23 make it very clear to our minds that the testator did not intend anything contrary to this legal principle, but that he did intend to charge his executors and trustees with the affirmative duty of keeping the principal of the estate at all times intact, and of seeing that moneys which, though called income or dividends, in truth represented a diminution of the property of the estate should not be paid out to the life tenants.

The argument that the words "capital invested" should be construed as meaning capital stock does not seem to us of any serious force. The word "capital" is sometimes used as the equivalent of capital stock, but it is probably more frequently used to mean the corporate property. This subject was quite fully treated in the case of *Wells v. Green Bay &*

*M. C. Co.* 90 Wis. 442, 64 N. W. 69, where it was·said: "There is a distinction between the capital and the capital stock of a corporation. The capital of a ·corporation is the property or means which the corporation owns, and it may vary in amount, while the capital stock is fixed, and represents the interests of the stockholders, and. is their property." Numerous cases were there cited in support of the proposition which need not be again cited here.

It is doubtless true that the executors in dividing the dividends received by them between income and *corpus* took good care to make such a division as would render it certain that the estate should not be diminished, and it may well be that in some instances it has turned out, or may in the future turn out, that the *corpus* has been actually increased by placing too large a percentage of dividends to its credit. This result, however, does not call for any criticism of the acts of the executors, nor for any interference by the court with their conclusions. The testator placed the most implicit confidence in them, and gave them the fullest and freest control over the property, subject only to the definite limitations which he deemed necessary in order to accomplish the results which he wished to accomplish, and he further said specifically in item 23 that "the judgment and decision of my said executors and trustees respectively shall be *final* in ascertaining how much of every dividend received upon any shares of capital stock shall be considered as income received from the profits of the corporation for that year upon the capital invested." It would seem that words could go no further in the effort to place absolute discretionary powers in the hands of his executors in this regard. Doubtless he appreciated that the questions arising under this power would be delicate and difficult questions, not capable of mathematical certainty of decision, but requiring the weighing and balancing of probabilities without reaching any absolutely accurate result. Apparently he appreciated also the probability of legal contests

over these questions, and wished to close the doors to litigation so far as he could do so. In view of all these considerations, we cannot doubt that he concluded to make the executors' decision final and conclusive on every beneficiary. It was perfectly competent for him to do so, and it is the duty of the courts to see that his wish is fully carried out. In the absence of bad faith, fraud, or mere arbitrary action (neither of which is claimed), the executors' determination must be held conclusive. The word "final" has but one meaning, and that meaning is in no respect doubtful.

The circuit court, while holding that the corporations referred to in item 23 of the will were the corporations in which Mr. Wells owned stock at the time of his death and that the executors had power under the will to make division of the dividends between income and *corpus,* took considerable testimony as to the circumstances under which the various dividends were declared, the condition of the various corporations at the time of the declaration of the dividends, the sources from which the money used in paying dividends was derived, and the value of the property of each corporation, especially the value of the stumpage owned and cut by the lumber corporations. Upon this testimony the court made findings disapproving of the apportionment between *corpus* and income made by the executors of the dividends received from the Homestake Mining Company, the N. Ludington Company, and the H. Witbeck Company, and determined that in each case considerably larger sums represented profit and should be credited to income than had been credited by the executors. Had these questions been ordinary questions of fact to be originally determined by the court from the evidence before it, we should have no difficulty in approving the conclusions reached by the court, but such was not the case. The apportionments already made by the executors were final and conclusive unless made fraudulently or arbitrarily or as the result of a mistaken conception of their duty. The sit-

uation is precisely analogous to that which arises when by
agreement of the parties a matter in difference has been sub-
mitted for decision to a referee or arbitrator. In such case
the award is conclusive unless it can be impeached for fraud,
misconduct, or mistake, and it is to be noted that mistake
here does not mean error in judgment on matter of fact or
law, but a failure to know some material fact or legal right
in the light of which their judgment should have been, but
was not, exercised. *Consolidated W. P. Co. v. Nash,* 109
Wis. 490, 503, 85 N. W. 485; *Burnham v. Milwaukee,* 100
Wis. 55, 75 N. W. 1014. Approaching the question from
this standpoint, there can be no doubt that the trial court was
wrong in interfering with the apportionment made by the ex-
ecutors. It cannot be claimed for a moment that there was
any fraudulent or arbitrary conduct on their part, nor any
failure to know any material fact or legal right which should
have entered but did not enter into their deliberations or con-
clusions. Their judgment may have erred in favor of the
*corpus* of the estate and against the income, but it was their
judgment which Mr. Wells relied on,—not the judgment of
the circuit court. He knew the questions were delicate and
that human judgment is always subject to error, and so know-
ing he made their judgment final. It was their judgment
which he wanted, not the judgment of any court.

So much of the judgment of the circuit court as sets aside
or changes the apportionments between *corpus* and income
made by the executors and has been appealed from in this
appeal must be stricken out, and the conclusions of the ex-
ecutors reinstated and approved.

The next important question to be considered is the ques-
tion as to the proper division between income and *corpus* of
the fees of the executors during the administration. Both
the county and the circuit courts properly held that under the
provisions of item 22 of the will the fees and expenses of the
executors incurred in carrying out their duties as trustees

should be charged against the income, in order to ascertain the net income. This holding made it necessary to distinguish between those duties of the executors which related purely to the administration of the estate and those duties and services which related to the management of the trust property, in order that only fees and expenses relating to the first class of duties and services should be charged to *corpus,* and those relating to the second class to income. Considerable testimony was taken on the question as to the amount of the fees and expenses properly chargeable to each class of services. The gross sum was not in dispute, but it was manifestly a matter of great difficulty to make any accurate division in many of the items. The executors' fees for the whole period aggregated $98,972.17, of which amount *Mr. Upham* (who had the active business management of the estate) received $54,000, and the other executors $44,972.17. The county court concluded that only five per cent. of the fees paid to *Mr. Upham,* viz. $2,700, represented services in the administration of the estate and were chargeable to *corpus,* while the balance of *Mr. Upham's* fees, as well as the entire amount of fees paid to the other executors, represented services in the carrying out of the trust and were chargeable to the income. The circuit court, however, concluded from the whole evidence that ninety per cent. of the entire amount of the executors' fees related to management and care of the trust property and should be charged against income, and ten per cent. related to mere administration and should be charged to *corpus.* This is rather a question of fact than of law. As to the value of the services and the proportionate amount thereof chargeable against the two funds the court was entitled to exercise its own judgment and was not bound by the testimony of witnesses. We feel unable to say that the finding of the circuit court is against the preponderance of the evidence on this question, and hence there must be an affirmance so far as these items are concerned. Upon prac-

tically the same principles the division made by the circuit court between *corpus* and income of all of the items of disbursements must be affirmed without detailed mention.

Complaint is made of the conclusions of the circuit court as to the disposition of the sinking funds created by the executors in order to meet possible shrinkage in value of United States bonds held by them. Those conclusions were that as to certain United States bonds held by the deceased and which were still owned by the estate, which according to the appraisal of the estate commanded a considerable premium at the time of the decease, the executors rightfully set aside and credited to *corpus* a portion of the annual interest received upon them to meet the shrinkage on their value as they approach maturity; but that as to bonds which had been resold by the executors (whether owned by the deceased at his death and appraised at a premium, or afterwards purchased by the executors at a premium), so much of the sinking fund previously set aside by them as was not needed to make good the difference between the appraisal (in case of bonds owned by the deceased) or the cost (in case of bonds purchased by the executors) and the sales price, should be taken from *corpus* and credited to income.

This court has definitely adopted the principle that where a trust is created in funds of which the income is to be paid to certain beneficiaries for life and the principal to others on the termination of the life estate, and the trustees invest a part of the funds in securities at a premium, the trustees should take from the annual income and add to the *corpus* such sum as will under established rules at the maturity of the securities repay to the *corpus* the amount paid as premium, and pay to the life tenant the balance only of the annual income. As only the face of the obligation will be paid at maturity, it is evident that the *corpus* of the estate will lose the amount paid as premium unless some such course be pursued. In other words, when securities are at a premium the annual

interest payment represents not only the interest on the investment, but a part of the premium paid for the security which is necessarily a part of the principal, and cannot be justly paid to the life tenant if the remainderman is to receive that to which he is entitled. *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365. In that case the principle laid down in *New England T. Co. v. Eaton,* 140 Mass. 532, 4 N. E. 69, was quoted and approved as follows:

"There can ordinarily be no better test of the true income which a sum of money will produce, having regard to the rights of both the tenant for life and the remainderman, than the interest which can be received from a bond which sells above par, and is payable at the termination of a fixed time; deducting from such interest, as it becomes due, such sums as will at maturity pay the premium."

It is also held in the case cited that even though the securities may appreciate in value, so that they would sell for a larger sum than would be necessary to restore to the *corpus* of the estate that which was taken from the estate to purchase them, still the rule is not changed, because this would give the profit occasioned by the rise in market value to the life tenant, although such tenant is not responsible for the loss if the market goes the other way. The life tenant is not entitled to the chance of profit unless he also bears the corresponding chance of loss.

It is true that it has been held by the supreme court of New York (*McLouth v. Hunt,* 154 N. Y. 179, 48 N. E. 548), that, in case of trust securities transmitted by the testator, the question whether the depreciation of the premium resulting from approaching maturity of the bonds should be borne by the life tenant is to be determined by the intention of the testator as gathered from the will in the light of the relationship of the parties and the surrounding circumstances. In that case the will provided that the life tenants should receive the "full income," and it was held that the intention of the

testatrix evidently was that they should receive the full amount of the annual interest.

It is unnecessary in this case to decide whether there is any logical difference in the rules of law which should apply to securities held by the deceased at a premium and to securities purchased by the executors at a premium.   We are quite well convinced that the will in the present case shows very clearly that the testator intended primarily that the principal or *corpus* of the estate should at all hazards be preserved intact. The use of the words "net income" in indicating the amounts paid to the life tenants and the abundant powers which he gave to his executors to finally determine the amount of the "net income" are very persuasive.   Our conclusion is that as to both classes of securities the sinking funds were properly created and added to the *corpus,* and should have remained in the *corpus* notwithstanding the subsequent sale of some of the securities at a price which left a small balance in the sinking fund.   In this respect the judgment of the circuit court must be modified as indicated.

When the appeal in this case reached the circuit court there was filed by the appellant *Daniel Wells Norris* a long petition asking that certain alleged issues be tried and determined upon the appeal.   Some of these issues were academic in their nature, and contemplated that the court should answer a series of questions as to the proper construction of certain parts of the will, and give its opinion as to the rights and duties of the trustees, the life tenants, and the remaindermen under the will.   So far as these questions were legitimately involved in the settlement of the final account, the petition was unnecessary, for all those questions were brought before the court by the appeal.   So far as those questions were not necessarily or legitimately involved in the settlement of the final account, they had no proper place in the trial.

Certain new matters were, however, presented to the court

in the petition which we think were entirely proper to be presented and considered, notwithstanding the fact that they had not been submitted or passed upon by the county court.

Briefly and without entering into details, the facts alleged were in substance that the directors of certain of the corporations in which the estate was largely interested as stockholder did not annually distribute the earnings of those corporations, but added the same to the surplus account, thus enhancing the value of the stock, and the claim was made that the amount of enhancement to the stock held by the estate in each case should be taken from the *corpus* and apportioned to income by the executors, and paid out by the executors to the life beneficiaries who were such October 31, 1906, with interest from that date. This claim was founded on the proposition that inasmuch as the executors as individuals owned stock in the corporations which, together with the stock owned by the estate, constituted a majority of the stock, they should have compelled the declaration of dividends by the corporations, and not having done so may be compelled in this proceeding to account to the life beneficiaries as if dividends had actually been declared.

We pass the objection made by the executors, that these claims are new matter and cannot be brought into the case on the appeal because they were not suggested or claimed in the county court, with but one remark. The question before the county court was the proper settlement of the final account of the executors. The whole subject of their handling of the estate from start to finish was open for consideration in both county and circuit courts. To hold that because certain items which should have gone into the account in the county court could by virtue of that omission be barred from consideration upon the appeal in the circuit court would be little short of ridiculous. The case comes to the circuit court for a trial *de novo* of all questions relating to the dealings of the executors with the trust funds, and none of those dealings can

be barred out because omitted in county court. But we do not think that the circuit court was right in its conclusions on these claims. Courts will not interfere with the discretion of corporate directors and compel the declaration of a dividend in the absence of fraud, bad faith, or wilful abuse of discretionary power. *Morey v. Fish Bros. W. Co.* 108 Wis. 520, 529, 84 N. W. 862. By compelling the trustees to transfer from the *corpus* of the estate to the income the sums which the trial court holds should have been declared as dividends, the court substantially decides that the executors were guilty of bad faith; but, as said before, there is no claim here that the executors were guilty of bad faith or fraud in any of their acts, and the trial court has found none. Were there such a finding, we should be slow to say that the court could not surcharge the account in favor of the life beneficiaries in precisely the way it has done, even in the absence of the corporations themselves from the litigation, but without that finding we are fully convinced that it cannot do so. An increase in the value of the *corpus* of the estate, resulting simply from the lawful and proper increase of the surplus of one of the corporations in which it holds stock, does not become income under the terms of the will. In this respect the judgment cannot be approved.

There are a number of minor contentions made on the merits of the case which have been examined, but are not considered meritorious, and which are overruled without comment.

Before closing this opinion we are compelled, however, to consider the question as to the propriety of the allowances made by the circuit court to the various guardians *ad litem* who represented the interests of the minor beneficiaries in that court. By the judgment the following sums were allowed to the guardians, viz.:

| | |
|---|---|
| Frank B. Van Valkenburgh | $4,349 75 |
| John M. W. Pratt | 800 00 |
| Charles A. Vilas | 135 00 |

| | |
|---|---:|
| John F. Harper | $1,150 00 |
| Guy D. Goff | 1,100 00 |
| William D. Van Dyke | 335 00 |
| William W. Wight | 500 00 |
| F. H. Bottum | 165 00 |
| G. D. Van Dyke | 800 00 |

All of these sums (except the sum allowed to Mr. Wight) were ordered to be paid out of the *corpus* of the estate, because the minors respectively had no available property out of which the court could direct payment. Mr. Wight's ward having a present available interest in the estate, his fees were made a lien upon that interest and no appeal has been taken from that part of the judgment.

It is admitted that the court had power under the provisions of ch. 267, Laws of 1907 (now sec. 4041*b*, Stats. 1911), to make an order of this nature, but the question is whether the sums allowed can be held to be proper sums under the terms of that statute.

The statute says that the guardian may be allowed "compensation" for his services out of the body of the estate if the ward have no available property out of which such payment can be directed by the court. In a series of decisions this court has announced in no uncertain terms what "compensation" as here used means.

It means a reasonable charge, not measured by the high salaries or rewards for services which large establishments and wealthy clients may voluntarily pay to lawyers of their choice, but measured more nearly by the compensation which the law allows to public officers having similar duties. The reason is that guardians *ad litem* are in a true sense public officers, and not merely that but public officers of *justice*. The cases laying down this general doctrine are *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 86 N. W. 243; *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250; *Will of McNaughton,* 138 Wis. 179, 118 N. W. 997, 120 N. W. 288. We do not deem it necessary to quote from these cases or state again the

principles upon which they rest. The cases speak for them-
selves and express the present position of the court as fully
as though it were stated over again.

We would not be understood as minimizing in any respect
the ability and industry of the gentlemen who have faithfully
represented their infant wards in the present litigation.   The
interests involved were very large, the questions were numer-
ous, and the time necessarily consumed in the various trials
and in preparation has been considerable.   The circuit court
found that Mr. Van Valkenburgh had spent fifty-eight days
in the circuit court, two and one-half days in county court,
and one hundred and thirty-five days out of court in perform-
ing his duty as guardian; Mr. Pratt, twenty-four days in
court and one day out of court; Mr. Charles A. Vilas, three
days in court and two days out of court; Mr. Harper, thirty-
two days in court and five days out of court; Mr. Goff, thirty
days in court and six days out of court; Mr. W. D. Van Dyke,
five days in court and ten days out of court; Mr. G. D. Van
Dyke, twenty-four days in court; Mr. F. H. Bottum, three
days in court and four days out of court.   Granting all this
to be true, and granting also that many of these gentlemen
could easily have earned much larger sums if they had spent
their time in the regular practice of their profession, we are
still forced to the conclusion that the compensation has not
been awarded upon the true basis, namely, the amount which
the law would allow to public officers having similar duties.
We regard these sums as too large under the principle which
has been applied by this court in the cases cited.

The work is primarily and chiefly the performance of a
duty imposed by the court upon one of its own officers to aid
it in the administration of the law, and only incidentally is it
the performance of work for a pecuniary compensation.   The
compensation which is deemed sufficient for somewhat similar
services by the lawmaking power is exemplified by the sums
allowed to bar examiners, viz. $10 per day, to counsel ap-

pointed to defend indigent defendants, viz. $15 per day in court and $10 per day out of court, and to divorce counsel, viz. $10 per day. In the case of the bar examiners, from two to three months of hard work are expended every year by a number of active and able members of the bar simply because they know that they are discharging a duty imposed by this court, and not because they receive anywhere near what their services would bring them in the field of private clientage.

Roughly speaking, it seems that the trial court allowed $33 per day for days spent in court and $17.50 per day for days spent out of court.

Without enlarging further upon the subject, we shall simply state our conclusion that the sums allowed are too large by nearly or quite fifty per cent. and must be reduced to the following amounts: F. B. Van Valkenburgh (including expenditures), $2,179.75; J. M. W. Pratt, $400; Charles A. Vilas, $70; John F. Harper, $600; Guy D. Goff, $550; W. D. Van Dyke, $170; G. D. Van Dyke, $400; and F. H. Bottum, $85.

Complaint is made as to the costs allowed to *Mr. Norris* in the circuit court, but it is not considered that the decision of the circuit court in this regard should be changed.

*By the Court.*—Judgment modified as indicated in this opinion and as so modified affirmed, the costs of printing the case and the fees of the clerk of this court to be taxed and paid out of the estate. Each guardian *ad litem* who filed a brief in this court is allowed $150 as compensation, and the cost of printing his brief, to be paid from the body of the estate. No other costs are allowed.

Motions for a rehearing made on behalf of the appellant *Daniel Wells Norris* and by *Frank B. Van Valkenburgh,* guardian *ad litem* for certain infants, were denied on March 17, 1914, with $25 costs to be taxed in favor of the executors and against the appellant *Norris.*