ESTATE OF TEASDALE: TEASDALE (Flora) and others, Appellants, vs. TEASDALE (Howard) and others, Respondents.*

*February 5—March 7, 1952.*

\* Motion for rehearing denied, without costs, on June 3, 1952.

For the appellants there were briefs by *Aberg, Bell, Blake & Conrad* and *Charles P. Seibold,* all of Madison, and *Rice, Rice & Rice* of Sparta, and oral argument by *Mr. Glen H. Bell, Mr. Seibold,* and *Mr. Z. S. Rice.*

For the respondents Howard Teasdale and Joseph Teasdale there was a brief by *Donovan, Gleiss, Goodman, Breitenfield & Gleiss* of Sparta, and oral argument by *Leo J. Goodman* and *William M. Gleiss.*

For the respondent Loretta Teasdale there was a brief by *Winton & Winton* of Shell Lake, and oral argument by *Ward Winton.*

BROWN, J. Findings of fact by the trial court will not be set aside unless they are contrary to the great weight and clear preponderance of the evidence. *Swazee v. Lee* (1951), 259 Wis. 136, 47 N. W. (2d) 733; *Estate of Witwer* (1948), 253 Wis. 536, 34 N. W. (2d) 671. The court found that in fixing the gross cash value of the estate at $327,828.57 the trustees acted arbitrarily and disregarded the testator's plainly expressed intention to determine the gross cash value on the day prior to death; that they acted so unreasonably that they are found to have acted in bad faith; and that they had in fact already determined that such value was $186,933 as of the date of death and found that such sum was the value of the gross estate on the day preceding death.

The appellant trustees submit that the will provided the determination of value by the trustees shall not be open to review but shall be final and conclusive, and therefore the court must observe the prohibition. In *Estate of Wells* (1914), 156 Wis. 294, 144 N. W. 174, the will made the determination of executors and trustees "final" upon certain apportionments. We said that words could go no further in the effort to place absolute discretionary powers in the hands of his executors in this regard. And we then said (p. 306), "In the absence of bad faith, fraud, or mere arbitrary action, . . . the executors' determination must be held conclusive. . . ." We consider that in the instant case the trial court was privileged to examine the determination of value and to set it aside if it was made in bad faith, or was a mere arbitrary action.

We will first consider the trustees' contention that the court erred in finding that they had previously determined the gross cash value of the estate to be $186,933, and they never made any determination whatever until November 1, 1950, when they reported $327,828.57. It is true, as they say, that the original appraisal was made by appraisers, not by the trustees, and the will contemplated that for the purposes of Item 9-B the judgment of the trustees was to be controlling. The executors' report to the court and to the department of taxation, on September 14, 1937, however, was not the report of third parties but of two of the three persons who are now trustees. In reporting the market value as of the day of death, January 14, 1936, they might feel bound to report the figures determined by the appraisers, but they were not required to state under oath that to the best of their knowledge, information, and belief the property was appraised at the clear market value. Indeed, if they knew or believed otherwise it was their duty to say so and was a fraud upon either the state or the heirs to certify the values as they did. Be that as it may when the executors, two of

whom are now trustees, calculated the widow's legacy under Item 9-B of the will for tax purposes, they did not use the figures which, in the same document, they had reported as the clear market value as of the day of death, $154,543.44, but reported that as of the day preceding the death the gross value was $159,378.45. Counsel explains that these, too, are appraiser's figures, taken from the federal tax return. The return is not in the bill of exceptions and we cannot check, but we do not doubt his word. Nevertheless, the difference between the two sets of figures in the same report is puzzling and warrants a belief that in the computation of the cash legacy under 9-B the executors, one of whom was the legatee, took from the available figures the most favorable ones which could be substantiated. The operation of 9-B under the executors' calculation produced a cash legacy to Mrs. Teasdale of $500.95 and a residuary legacy of $1,630.65. The various taxing authorities refused to accept the appraisals and informational returns and insisted on revisions which brought the gross value of the estate on January 14, 1936, to $186,933. The executors did not contest this figure and inheritance taxes were calculated and paid on that basis.

All this, of course, took place before the estate was settled and the executors were translated into trustees. Nevertheless, the trial court found that the trustees at this time had determined the gross market value to be $186,933. We agree with the court that in such a matter "gross market value" is the equivalent of "gross cash value" but we do not think the evidence sustains the court in finding this to be a determination of value by the trustees, though undoubtedly it is a representation by persons who later became trustees and has a bearing on their good faith. Two of the three individuals who are now trustees did report that $159,378.45 was the clear market value of the estate as of January 13, 1936. They did it as executors and seek to repudiate it as trustees and to substitute a value of $327,828.57. They themselves

testified that in their trustees' determination of value they were attempting to set real values or true values on the various properties of the estate and were not trying to state the cash value, as the will directed they should. To do this they took into consideration factors which were not known at the date of Mr. Teasdale's death but which were known and were effective to alter cash values in 1950. Thus in 1950 they assigned to the capital stock of Monroe County Telephone Company and to Sparta, Wisconsin, real estate *as of 1936,* values which reflected the activation of Camp McCoy, six miles away, during World War II, and they greatly increased the values given the Texas real estate. The trial court, properly, we think, took judicial notice that the war economy greatly increased values in Sparta and prices realized during the war years or thereafter were much greater than the cash values of 1936. The trustees insisted that the values as stated by them were inherent in the property all the time as borne out by later developments. The difficulty with that is that the will did not direct them to determine real value or speculative value and did not even leave it to their discretion to select what kind of value they would determine. The cash value of the gross estate on the day preceding the death of the testator is what the will demands. The trustees ignored that direction, admittedly sought a "real," not the cash, value and then certified that which they considered the real value was the cash value as of the day before the death. This was an arbitrary departure from the directions imposed on them by the will and their determination must be set aside on that ground.

The trial court found that the trustees made their determination of value in bad faith. Legitimate, logical inferences from established facts lead to that conclusion. Such facts and inferences are: The original appraisal was an effort by qualified, disinterested persons to determine the value of the estate in money as of the day of death. This stated the

value to be $154,543.44. The executors then, in computing the widow's share for inheritance-tax purposes, certified that on the day before the death to the best of their knowledge and belief the gross value of the estate was $159,378.45, which the widow's interest as joint tenant in realty brought up to $164,529.80. Mrs. Teasdale was one executor and Howard Teasdale was the other who signed this report. Their interests as heirs were adverse to each other to the same extent then as now. Taxation bodies considered the value to be $186,933. It is unlikely that the values thus checked and re-checked within four years from the time when Mr. Teasdale died were far away from the actual cash or market value of the estate either as of the day of the death or the day preceding it.

When the trustees took over the residue of the estate on November 15, 1939, they inventoried the properties as of that date at values corresponding to the original appraised value adjusted to conform to the values used by the tax authorities. This was convenient, perhaps, but not compulsory if the trustees considered the properties had other values. There is no indication that they so considered. These matters certainly are persuasive that in the judgment of the trustees there was nothing materially wrong with the cash or market values of the original appraisal as of January 14, 1936, or with their own estimate, as executors as of January 13, 1936, particularly as modified by the taxation officials. Then came the time of distribution. If the trustees thought they had never determined and stated the gross value of the estate as of January 13, 1936, it would have been convenient and proper for them, as trustees, to adopt and state the value of $159,378.45, which they had certified as executors, or of $186,933, asserted by the tax bodies which they had accepted. They chose to make an independent valuation. The trustee, Mrs. Teasdale, stood to fare better, by reason of the will's formula, if the value of the estate as of January 13, 1936, was

increased. Her gain, of course, was at the expense of the residuary legatees for whom she was also a trustee. Mrs. Teasdale, then, her brother Mr. Morrill, and her sister-in-law Mrs. Morrill, acting as trustees, determined and stated that the gross cash value as of January 13, 1936, was $327,828.57. They accomplished this by raising the values they, as executors, for the assessment of taxes had reported under oath to the tax authorities and which they as trustees had, as of November 15, 1939, and regularly thereafter, reported to the court in their trustees' inventory. Thus, the appraised value of the Texas real estate was now raised from $9,500 to $43,356; the Wisconsin real estate from $20,635.52 to $52,290; and the stock of the Monroe County Telephone Company from $96,450 to $160,000. Other properties were also revalued to reach the total of $327,828.57 and this was certified to be the gross cash value of the estate on the day before Mr. Teasdale's death. With this valuation Mrs. Teasdale's specific legacy, under Item 9-B of the will is about $82,000, whereas under the original appraised values it came to $500.95. This startling difference between the official statements of two of the three present trustees when they acted as executors, or when as trustees they assumed the trust, and the present when the one of their number who is directly interested stands to profit was explained by the contention that the trustees were attempting to fix real values which were confirmed by subsequent developments. Since we believe this to be quite foreign to the clear command of the will to determine cash values as of a certain day, it is not convincing. When a trustee deals with trust property to his or her advantage and to the disadvantage of other beneficiaries a court of equity should give close and jealous scrutiny to the transaction. We cannot believe from the circumstances shown by the whole record that there was any motive other than the desire of the trustees that one of their number should have an increased portion of the estate and

this was a way to accomplish it. We consider that the finding of bad faith is not contrary to the great weight and clear preponderance of the evidence, and that the quantum of evidence in its support and the logical inferences therefrom is clear and convincing. The finding must be sustained.

Having set aside the valuation of the trustees by reason of their bad faith in making it, the court found and determined that the gross cash value of the estate was the same on the day of death and the day preceding it and that such value was $186,933. The appellants contend that there is no evidence to support this particular figure. The support is found in their own report to the county court, as executors, of the increased valuations which the various taxation authorities insisted were the market value of certain properties on the day of death. By adding these increases to the figures first reported by the executors the sum is reached. Whatever is controversial in the calculation favors the appellants. We consider that the evidence supports the finding.

The trustees submit that their discretion in adopting values is conclusive and the court may not substitute other values. The words of the will putting the acts of the trustees beyond review are not to be taken literally; otherwise a trustee would have power to destroy the trust. The words do dispense with the standard of reasonableness in judging the trustee's conduct but do not permit him to act dishonestly or act in a state of mind in which the trustor did not contemplate he would act. The courts will not permit him to act dishonestly or from some motive other than the accomplishment of the purposes of the trust. See Restatement, 1 Trusts, p. 488, sec. 187. When the court found that the trustees in the present case acted in bad faith it became the court's duty to see that the purposes of the trust were accomplished. It did this by determining the gross cash value at the highest point which the evidence would permit. This was not error, in our opinion, and the court having so determined, the trustees

will be required to use that figure in calculating Mrs. Teasdale's inheritance under Item 9-B of the will. Such a computation results in a cash payment of $11,316.61,—a very substantial increase over the sum of $500.95 which Mrs. Teasdale and Mr. Morrill computed when, as executors, they advised the tax authorities what her legacy would be so that her tax might be determined. (She would also receive approximately $50,000 as residuary legatee and an undivided one third of the estate's half interest in Texas realty, in addition to specific properties devised and bequeathed to her in other portions of the will.) We consider the finding of the court, carried into the judgment, is within the powers of the court in accomplishing the intent of the testator and protecting the rights of the other beneficiaries of the trust when the trustees thereof have acted in bad faith.

Passing to the dispute concerning salaries paid to the trustees, the trust estate owned ninety-seven per cent of the capital stock of the Monroe County Telephone Company, six hundred forty-three shares, appraised at $96,450. With such control the trustees elected themselves the principal officers of the company and established their own salaries. For a time Howard Teasdale managed the company. After his resignation a manager was hired. Mrs. Teasdale spent many months each year in Texas; Mr. Morrill was a schoolteacher in Milwaukee, Mrs. Morrill was a housewife. Mrs. Teasdale held office for fifteen years and was paid $47,825. Mr. Morrill received $44,358 for fifteen years' incumbency; Mrs. Morrill got $3,200 for five years. The annual amounts varied, smaller in the earliest years and greater in recent ones. The court took testimony concerning services rendered and found the salaries were excessive. It found that $27,000 would have been fair and reasonable compensation for the labors of Mrs. Teasdale; $9,000 in the case of Mr. Morrill; and $1,500 in the case of Mrs. Morrill. It found, further, that the excess over these amounts belonged to the trust estate, not the telephone company, and surcharged

the account of the trustees in that amount. The judgment so provided and the trustees appeal.

The trustees also asked the court to allow them $25,000 as trustees' fees over the eleven years of the trust. The trial court allowed $12,000 and they have appealed from that, also.

The compensation which Mrs. Teasdale, Mr. Morrill, and Mrs. Morrill are allowed as officers of the telephone company and as trustees must be considered together. The interests of the trust estate might and probably did require the trustees to participate in the management of the telephone company. In such management the individuals were still trustees and accountable as such. In this respect the present case is much like *Estate of Peabody* (1935), 218 Wis. 541, 546, 260 N. W. 444. In *Estate of Peabody,* we held, page 548, that the combined salaries from the corporation and fees as trustees should provide a reasonable compensation for the service rendered to the trust estate. The trial court there found the combined compensation unreasonable and ordered the excess paid to the trust estate. The surcharge feature of the judgment was not discussed in the opinion and the case is not authority for surcharging the account of the trustees in favor of the trust estate. Such authority, however, is found in *In Re Smythe's Estate* (1942), 36 N. Y. Supp. (2d) 605, 613, where an excessive salary to an executor who operated an incorporated business for the estate was surcharged upon him and ordered paid to the estate. In the *Peabody Estate* matter, we recognized that when fiduciaries perform services not customarily required of them they are entitled to fair compensation but held that their compensation from all sources should not exceed a reasonable allowance for the services they have rendered to the trust by reason of all their activities. 54 Am. Jur., Trusts, p. 420, sec. 532, citing the *Peabody Case, supra,* states the matter thus, "But in the case of a trusteeship operating a business, the rule is that since the trustees in operating the

business are still acting as trustees, services and compensation of the trustees must be treated under some method of accounting in which the trusteeship is the dominant element, and the services in the business and in the trusteeship are to be treated as a unity for the purpose of an allowance of a unity of compensation properly augmented for the extraordinary services." As a general rule we believe that a trustee managing a business or performing other service for it earns the going rate which owners would pay a nontrustee hired for the same services, and that such rate is a correct measure of the services which he renders the trust in so acting and of the compensation which a trial court may properly allow him therefor. But the matter of trustees' compensation, after all, is for the court and general rules give way to the trial court's sound discretion influenced by the particular circumstances of each case. "The fundamental criterion [of compensation] is reasonableness, determined in the light of the facts and circumstances of each case." 54 Am. Jur., Trusts, p. 418, sec. 530.

In the instant case the trustees are not professionals in the telephone business, nor even professional business executives. Obviously they are not the sort of people whom a telephone company would employ, part time on a commercial basis in the open market, to be president, secretary, and treasurer of the corporation. They held those positions because they controlled the stock, set the salaries, and elected themselves to the offices. On cross-examination they revealed a lack of knowledge of the details of the business for which, nominally, they were the executive officers. It was not an abuse of discretion for the trial court to decline to apply to them the standards of compensation fit for competent career men in such positions.

In its memorandum decision the learned trial court frequently referred to *Estate of Peabody, supra.* Trustees there operated a mercantile business which was trust property. In the opinion at page 546 (218 Wis.), we said: " . . . because

of the corporate entity and the existence of other interests, some distinction between it and the balance of the services rendered as trustees should be made. . . . The services and total compensation must therefore be treated under some method of accounting in which the trusteeship is the dominant element." We remanded that cause for further consideration in the trial court because it appeared to us that attention had not been paid to the special duties which the trustees were required to perform. The trial court in the instant case evidently had our words in mind when it determined separately the reasonableness of the salaries which the trustees drew from the telephone company and their reasonable compensation for their other activities as trustees and set up these amounts separately in the findings, conclusions of law, and judgment. Its judgment allows them $12,000 for their services as trustees, to be divided proportionately to their length of service, plus $37,500 for their services as officers of the telephone company, divided as stated, *supra.* This is tantamount to a finding that $49,500 is just and fair compensation for their services to the trust estate in all capacities and from all sources. We affirm, as lying within the trial court's discretion, the allowance of $49,500 as compensation to the trustees for their services in all capacities and the surcharge of any excess.

The plan of liquidation and distribution proposed by the trustees was predicated upon the court's acceptance of their determination of value. That being disapproved and new values substituted they should be released from the plan and given the opportunity to submit other procedures for the approval of the county court if they so desire.

The learned trial court postponed allowance of attorneys' fees pending statements for services rendered. In so doing the court called attention to *Will of Matthews* (1921), 174 Wis. 220, 224, 182 N. W. 744, in which we said that an allowance of $3,500 appeared to be the maximum allowance permissible to attorneys in the probate of an estate of

$250,000. The duties and responsibilities of attorneys have increased greatly in the intervening thirty years and compensation reasonable and customary in 1921 is no longer so, at the bar as in other pursuits. We do not wish the trial court to be guided by our statement in *Will of Matthews, supra.*

*By the Court.*—Judgment affirmed and cause remanded for further proceedings consistent with this opinion. The brief of respondent Loretta Teasdale exceeds fifty pages and counsel has made application to tax printing costs of the entire brief. Such permission is granted, under Rule 10 (sec. 251.264, Stats.).

The following memorandum was filed June 3, 1952:

PER CURIAM (*on motion for rehearing*). The mandate is amended to provide that such credits as the trustees may have shall be offset against the surcharge. Other relief sought by appellants is denied. No costs to be taxed.

---

* Motion for rehearing denied, with $25 costs, on June 3, 1952.