HOLTY, Appellant, vs. LANDAUER and others, Respondents.*

*May 3—June 1, 1955.*

* Motion for rehearing denied, with $25 costs, on September 13, 1955.

For the appellant there were briefs by *Whyte, Hirschboeck & Minahan,* attorneys, and *Victor M. Harding* and *Richard P. Buellesbach* of counsel, all of Milwaukee, and oral argument by *Mr. Harding.*

For the respondents there was a brief by *Fairchild, Foley & Sammond, Marvin E. Klitsner,* and *Harrold J. McComas,* all of Milwaukee, and oral argument by *Mr. Klitsner* and *Mr. McComas.*

MARTIN, J.    Adolph Landauer, grandfather of the plaintiff and father of Joseph A. Landauer, deceased, operated a wholesale dry-goods business as a sole proprietorship under the name of A. Landauer & Son. He also operated several retail stores, including the Fair Company and the Fair Stores Appliance Company, Wisconsin corporations, at Wausau, Wisconsin. Adolph Landauer died in 1925, and in his will he provided for the establishment and maintenance of a trust during his widow's lifetime from the income of which, among other things, the plaintiff should receive $250 monthly. Joseph Landauer was appointed one of the trustees. At the death of the widow in 1935, plaintiff signed a receipt for his distributable share of the trust estate and the trust was duly terminated.

During this time the Landauer business enterprises were carried on. When the trust was terminated the stock of the Fair Company of Wausau was divided equally between Joseph A. Landauer and the plaintiff, as directed in the Adolph Landauer will, and a certificate for 232 shares was issued to the plaintiff as of January 14, 1935.

A. Landauer & Son was incorporated in 1937 and thereafter operated the retail stores. A certificate for 536 shares of stock in the new corporation was issued to plaintiff December 2, 1937.

After the incorporation of 1937 the plaintiff, who resided in New York, received monthly payments through the Fair Store of Wausau and from May, 1943, on, through A. Landauer & Son, Inc. On May 8, 1942, Joseph Landauer wrote to plaintiff as follows:

"The books were set up I believe at the end of 1937 or the first part of 1938, at which time you had a credit of

$53,600. Your monthly withdrawals ever since that time were $450 a month or in total, $25,474.53, leaving a balance of $28,125.47.

"On the preferred stock, of which you had $5,000, this still remains intact. . . .

"So in total dollars you have standing to your credit at this time, $33,125.47. . . . you can readily see that of the total amount of money that you have to your credit, namely $33,125, if you continue to draw $450 or $475 monthly the same will last you approximately six years, maybe a little less or more. . . ."

As of January, 1943, the books of the company showed an indebtedness from the plaintiff of $29,320.53. On May 20, 1943, plaintiff's account was credited with $29,000 and $24,600 (a total of $53,600) and stock-certificate stubs bearing the same date show the issuance of 246 shares to Joseph A. Landauer and 290 shares to A. Landauer & Son, Inc. (a total of 536 shares).

On April 24, 1943, Joseph Landauer made a will providing for the establishment of a trust out of his entire holdings in the Landauer corporation to continue for fifteen years after his death, the income payable $500 per month to his widow, Frances O. Landauer, $75 per month to a cousin, and $400 per month to plaintiff. It was also provided that of the annual distribution of the balance of income plaintiff was to receive 10 per cent in cash and 10 per cent in trust for the life of the trust and at the end of the fifteen years plaintiff was to receive such accumulations of trust income as well as 45 per cent of the trust principal.

On September 29, 1949, Joseph Landauer made a new will providing that his widow should receive one half of his entire estate and the balance of the Landauer corporation stock was to be left in trust for fifteen years, the income payable $750 per month to the widow, $100 per month to her mother, and $400 per month to plaintiff. The balance of the income was to be paid to the widow and at the end of the

fifteen-year period the entire principal of the trust was distributable to her.

It is undisputed that on May 20, 1943, plaintiff's stock was transferred to Joseph Landauer and the company. Plaintiff contends that he agreed to the transfer on the sole basis of a contract between Joseph Landauer and himself (Exhibit 35). The alleged "testamentary commitment" is contained in an undated, unsigned document reading as follows:

"You had originally...................... $53,600.00
"You have drawn up to Jan. 1, 1943......... 29,320.53
  "Leaving balance                     $24,279.47
"You also have pfd. stock................. 5,000.00
                                     "$29,279.47

"You were credited with one dividend in '37 of $1,638.00 } 3% on $53,600.00

"I shall try and give you over a period of 3 years, starting in 1943, $8,000.00—which is about $1,600.00 per year, the equivalent for 5 years starting 1938–39–40–41–and 42. Will start this year with the first $3,000.00. This is in lieu of no dividends.

"Rather than making out a new certificate every year or two, your account at A. L. & S. will read as of January 1, 1943, $24,279.47 plus $3,000.00—$27,279.47.

"The above equals 272 shares of stock plus $79.42.

"You are not aware of the fact, but our losses in closing out Waupaca at a loss of $21,000.00 and Sturgeon Bay at a loss of $33,000.00 totaled $54,000.00 in 1940–41.

"While I was advised that our common stock should not be valued at over $80.00 per share, I am crediting you at par at $100.00 per share, and you didn't have to sustain any losses of the closing of the two stores.

"As long as you leave your money at A. L. & S., you'll be credited yearly at the rate of 3%. After I leave this earth, you can draw $400.00 monthly for 15 years; plus about, after

the years' businesses have been accounted, a sum of approximately $2,000 to $2,500 for 15 years, and also a like amount of $2,000 to $2,500 will be credited to your account for a period of 15 years.

"These figures in total should give your account each year for 15 years about $9,000 to $9,500. Naturally, these figures all depend on how well the businesses thrive; nevertheless are figured fair.

"After 15 years when the trust expires, you'll receive 'PLENTY.'"

Exhibit 7 is a carbon copy of Exhibit 35 with the portion beginning "After I leave this earth, etc.," in the third paragraph from the end removed. Exhibit 7 was given by Landauer to Miss Hoffman, the company bookkeeper, who kept it in the ledger and credited plaintiff's account with the sums therein mentioned "in lieu of dividends," which sums were charged against Joseph Landauer personally. Miss Hoffman could not remember when she first saw it but the fact that the first gratuity of $3,000 mentioned in the document was entered in the ledger as of December 31, 1943, makes it reasonable to conclude only that she received it sometime in 1943. That the document was considered by Joseph Landauer as a bookkeeping memorandum necessary to maintain plaintiff's account is evident from the fact that it was given to Miss Hoffman and clipped to the ledger sheet as a part of the company records.

It is plaintiff's contention that the portion of Exhibit 35 which was removed from Exhibit 7 before Miss Hoffman received it contains the testamentary agreement upon which he relies.

The trial court found:

"5. Exhibit 35, containing a notation with respect to Joseph A. Landauer's testamentary intentions, was delivered to Carl Holty during Joseph A. Landauer's lifetime; it is not established that said memorandum was delivered by Joseph A. Landauer or received by Carl Holty at the time of the purchase of the Holty shares on or about May 20, 1943, or

that it was in any way related to said purchase except in so far as a part of it summarized the results thereof. . . .

"9. Neither said statement of testamentary intention nor the Joseph A. Landauer will of April 24, 1943, constituted any part of the consideration for the sale or purchase of plaintiff's shares of stock, and there was no consideration for said statement of intention or will."

These findings are entirely supported by the evidence. In *Will of West* (1944), 246 Wis. 199, 203, 16 N. W. (2d) 806, it was stated:

"In order for appellant to succeed we must first find that there was an oral contract to devise or bequeath property. The rule is that such contract must be established by evidence that is clear, satisfactory, and convincing. Mere preponderance of the evidence will not support such contract. [Citing cases.] . . . We recognize the rule."

The evidence shows that as early as 1939 plaintiff was informed, by Landauer's tax consultants, that he was overdrawing his account and that in the event of his death such drawings would be a charge against his estate; that he could, if he desired, reduce the advances by turning back some of his stock. Plaintiff, however, contends that it was not until receipt of the May 8, 1942, letter from Joseph Landauer, portions of which are set out above, that he knew he was living on his capital. He and his wife testified that the Landauers visited them in New York in the fall of 1942 and Joseph Landauer then suggested that plaintiff transfer his stock to liquidate his indebtedness to the company; that thereafter on the occasion of another visit in the spring of 1943 Landauer presented to him the document which is Exhibit 35.

Although plaintiff asserts that the latter visit took place about April 1, 1943, prior to the making of the April 24th will, he admitted on the witness stand that he could have received the document either before or after April 24, 1943. Plaintiff's wife testified that she had no recollection when the

incident took place, other than plaintiff's statement to her that it was in the "spring of 1943." This is far from clear and convincing evidence that the document predated the will, especially in view of the testimony of Frances O. Landauer to the effect that from the middle of March until the middle of April, 1943, she and her husband were in the Southwest; that they did not go to New York until the end of April.

Under the evidence it was necessary for the trial court to conclude that Exhibit 35 did not predate the April 24, 1943, will. Thus, any possible merit in plaintiff's principal argument that the document set forth a testamentary contract pursuant to which Joseph Landauer made said will is vitiated; and the only reasonable inference that can be drawn from the document is that it was a statement of the voluntary provisions Landauer had already made for the plaintiff in the April 24th will. It is impossible to read into the language of the exhibit itself any testamentary intentions which are contractual in nature. There is no suggestion therein that such intentions were expressed in consideration of plaintiff's agreement to sell his stock. And the evidence indicates that plaintiff did not himself consider them in that light. In a letter dated August 9, 1948, Landauer reminded plaintiff that he had not indorsed the certificates which were canceled in 1943; advised that he intended to make a new will and "Before I rewrite that will I insist on knowing whether or not you propose to comply with my request to sign the stock certificate." Plaintiff thereafter signed and returned the indorsement with a letter stating:

"You will admit that at no time have I ever broached to you the question of your will and testament, no more than I ever asked my father, my grandfather, or grandmother about such things. I have always felt that if anyone involved is to mention such matters, it is the person who is going to leave an estate, not one who hopes to partake of it. What I know

of your intentions you yourself have told me, but I regret deeply that you brought up the question of your testament to use as an unbecoming threat."

Such an attitude is entirely contrary to plaintiff's claims that Exhibit 35 constituted a contract between them.

In the same letter plaintiff acknowledged that he had transferred and sold his shares of stock to his uncle and to the company in 1943; that he had been requested at that time to make full payment of his indebtedness to the company, which he could not do except by selling his stock. It is established without question that the price plaintiff received for his stock was $100 per share; that the amount due him at that price was credited to his account with the Landauer company and that by reason of his monthly withdrawals he had received the entire amount by November, 1950. There was expert testimony from which the trial court could find that the value of the stock in 1943 was actually much less than the price paid the plaintiff therefor and plaintiff does not challenge that finding. In our opinion plaintiff has offered no clear, satisfactory, and convincing evidence that any consideration, other than the $100 per share, was the basis for his transfer of the stock.

Plaintiff assigns error to the trial court in ruling out his testimony, under sec. 325.16, Stats., with respect to his "conversation" with Landauer at the time he came into possession of Exhibit 35. As abstracted by the plaintiff, the testimony in question reads as follows:

"I came to visit with Mr. and Mrs. Landauer at the Biltmore Hotel in New York about April 1, 1943. I had come from work and my wife was to join me there. Mr. and Mrs. Landauer had greeted me and Mrs. Holty had come in about ten minutes later. Mr. Landauer took me over to a window and he took this paper out of his pocket and said 'Here.' I read the paper, nodded by head, and shook hands with him.

I put the paper in my pocket. He stood there all the time while I was reading it. My wife had just come in and was taking off her coat and was greeting Mrs. Landauer who was getting a drink for us. They were in the same room."

We cannot see that such testimony brings out anything but that the document was handed to plaintiff by Landauer. Plaintiff's wife, whose testimony was admitted in its entirety, stated that she was in the room when the incident occurred and saw Landauer give the paper to her husband. Since her testimony has the same import as plaintiff's, it cannot be said that the exclusion of the same evidence by plaintiff would have had any effect on the court's decision. Even if it be assumed that such rejection of evidence was error, it could not have been prejudicial. *Will of Ehlke* (1945), 246 Wis. 654, 18 N. W. (2d) 490.

A study of the record reveals that not only has plaintiff failed to present clear, satisfactory, and convincing proofs of his claim, but the evidence presented, largely documentary in character, is overwhelmingly in support of the trial court's findings. Although a great deal more evidence could be specifically referred to, it would serve no purpose other than to unnecessarily extend this opinion. We have set out such portions as in our opinion show that the findings are amply supported.

As an alternative to specific performance of the alleged contract, plaintiff seeks rescission of the stock transfer on the ground of breach of fiduciary obligation owed him by Joseph Landauer. The trial court found that no fiduciary relationship existed between Landauer and the plaintiff except that of corporate director and stockholder. Plaintiff asserts that securities to which he was entitled out of his grandfather's trust estate, of which Joseph Landauer was one of the trustees, were never delivered to him but retained by Landauer; that in holding for plaintiff's benefit securities

that had been trust assets, the former fiduciary relationship continued. Plaintiff testified, however, that he made no claim that he did not receive all the assets to which he was entitled under his grandfather's trust, and it is undisputed that he executed a receipt for his distributable share at the time the trust was terminated and Joseph Landauer was discharged as a trustee. Under the circumstances there is no basis for considering that the fiduciary relationship continued thereafter.

The obligation Joseph Landauer, as an officer or director of the corporation, owed to the plaintiff as a stockholder when negotiating for the stock transfer was to disclose all facts regarding the company's business which would affect the price of the stock. It is contended that Landauer never furnished to plaintiff any information about the business which would enable him to form an intelligent judgment as to the value of his stock and that thus it was highly improper for Landauer to negotiate for the acquisition of plaintiff's stock. But the record discloses that plaintiff freely discussed the status of the business with his uncle and with Landauer employees whom he had occasion to see in New York; that he was permitted to peruse the company's records and that he received statements and other information respecting the value of his stock and the status of his account with the company. It is not contended that such information was false or misleading. Furthermore, as pointed out above, the actual value of the stock in 1943 was considerably lower than the $100 per share which plaintiff received.

The trial court found, and plaintiff does not question, that Joseph Landauer possessed the highest sense of honor and integrity. Plaintiff's insinuation that Landauer "overreached" him in the negotiations for the sale of his stock apparently arises out of his desire to have the value of the stock reconsidered in the light of the inflation that took place

during the years after he sold it, rather than from any showing that Landauer practiced deception or fraud. Failing to present such proof, he takes comfort in implying that the man whose bounty he accepted over a period of years took advantage of his business naïvete by not extending to him in the purchase of the stock an even greater gratuity than he did.

Since we hold that no testamentary agreement has been established and plaintiff is not entitled to rescission of the transfer, it is unnecessary to discuss other questions raised on the appeal.

We may say that the record in this case is a voluminous one, both as to testimony and documentary evidence, and we commend the trial court for its thorough understanding of the issues, as shown by its well-considered decision.

*By the Court.*—Judgment affirmed.

The following opinion was filed September 13, 1955:

PER CURIAM (*on motion for rehearing*). Appellant complains that the decision in this case failed to deal with the question whether gratuities received by Mrs. Landauer from the defendant corporations were detrimental to the interests of the other trust beneficiaries.

The gratuities referred to were found by the trial court, after considering exhaustive evidence on the subject, to be neither improper nor excessive. For some years prior to decedent's death Mrs. Landauer had, without compensation, assisted her husband in the management of the businesses and after his death she continued to participate in such management, likewise without compensation. The trial court found that her services were competent and valuable and that the gratuities were entirely justified as in lieu of any widow's allowance or compensation for said services. Under all the circumstances we find no error in the trial court's determina-

tion of the question. All the competent evidence in the record supports it and appellant failed to show any reason why it should not have been made.

Appellant points to language of this court in *Estate of Landauer* (1953), 264 Wis. 456, 59 N. W. (2d) 676, to the effect that if any advantages gained by Mrs. Landauer personally in receiving the gratuities in question were detrimental to other beneficiaries of the trust, the rules set out in *Estate of Peabody* (1935), 218 Wis. 541, 250 N. W. 444, and *Estate of Teasdale* (1952), 261 Wis. 248, 52 N. W. (2d) 366, can be applied. There is no showing, however, that the payment of said gratuities, which constituted tax advantages for Mrs. Landauer, actually had a detrimental effect on appellant's interest in the estate. In the first place, the payments must be held to be proper; and the trial court pointed out in its decision that any decrease in earnings experienced by the Landauer companies in 1951 and 1952 were due to many conditions arising out of general market changes. Further, the evidence shows that the income of the trust in the years in which the gratuities were made would have been insufficient, even if they had not been made, to pay beneficiaries having claims under the will prior to any interest or right thereunder of the appellant. Neither in his main brief, nor in his brief in support of this motion, has appellant presented arguments based on evidence contrary to the trial court's findings.

The motion for rehearing is denied with $25 costs.